Denis **HANLY** et al., Plaintiffs-Appellants,

· v.

Richard G. **KLEINDIENST**, as Attorney General of the United States, et al., Defendants-Appellees.

No. 357, Docket 72–1959.

United States Court of Appeals, Second Circuit.

Argued Nov. 6, 1972.

Decided Dec. 5, 1972.

Alfred S. Julien, New York City (Julien, Glaser, Blitz & Schlesinger, Jesse

A. Epstein, New York City, of counsel), for plaintiffs-appellants.

Milton Sherman, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., T. Gorman Reilly, Asst. U. S. Atty., New York City, of counsel), for defendants-appellees.

Before FRIENDLY, Chief Judge, and MANSFIELD and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

This case, which presents serious questions as to the interpretation of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4331 et seq.[1] ("NEPA"), the language of which has been characterized as "opaque"[2] and "woefully ambiguous,"[3] is here on appeal for the second time. Following the district court's denial for the second time of a prelimi-

---

1. The relevant portions of § 102, 42 U.S.C. § 4332, provide:

"The Congress authorizes and directs that, to the fullest extent possible: . . (2) all agencies of the Federal Government shall—

"(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have a [sic] impact on man's environment;

"(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment

and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

"(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;"

2. City of New York v. United States, 337 F.Supp. 150, 159 (E.D.N.Y.1972) (Friendly, Ch.J., speaking for a 3-judge court).

3. Harry H. Voight, The National Environmental Policy Act and The Independent Regulatory Agency, 5 Natural Resources Lawyer 13 (1972).

nary injunction against construction of a jail and other facilities known as the Metropolitan Correction Center ("MCC") we are called upon to decide whether a redetermination by the General Services Administration ("GSA") that the MCC is not a facility "significantly affecting the quality of the human environment," made pursuant to this Court's decision remanding the case after the earlier appeal, Hanly v. Mitchell, 460 F.2d 640 (2d Cir. 1972) (Feinberg, J.), cert. denied, Hanly v. Kleindienst, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (herein *"Hanly I"*), satisfies the requirements of NEPA and thus renders it unnecessary for GSA to follow the procedure prescribed by § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), which requires a formal, detailed environmental impact statement. In view of the failure of the GSA, upon redetermination, to make findings with respect to certain relevant factors and to furnish an opportunity to appellants to submit relevant evidence, the case is again remanded.

Since the background of the action up to the date of our earlier remand is set forth in *Hanly I*, we limit ourselves to a brief summary. Appellants are members of groups residing or having their businesses in an area of lower Manhattan called "The Manhattan Civic Center" which comprises not only various courthouses, government buildings and businesses, but also residential housing, including cooperative apartments in two buildings close to the MCC and various similar apartments and tenements in nearby Chinatown. GSA, of which appellant Robert L. Kunzig was the Administrator, is engaged in the construction of an Annex to the United States Courthouse, Foley Square, Manhattan, located on a site to the east of the Courthouse and immediately to the south of Chinatown and the aforementioned two cooperative apartments. The Annex will consist of two buildings, each approximately 12 stories high, which will have a total of 345,601 gross square feet of space (214,264 net). One will be an office building for the staffs of the United States Attorney and the United States Marshal, presently located in the severely overcrowded main Courthouse building, and the other will be the MCC.

The MCC will serve, under the jurisdiction of the Bureau of Prisons, Department of Justice, as the detention center for approximately 449 persons awaiting trial or convicted of short term federal offenses. It will replace the present drastically overcrowded and inadequate facility on West Street, Manhattan, and will be large enough to provide space not only for incarceration but for diagnostic services, and medical, recreational and administrative facilities. Up to 48 of the detainees, mostly those scheduled for release within 30 to 90 days, may participate in a community treatment program whereby they will be permitted to spend part of each day in the city engaged in specific work or study activity, returning to the MCC after completion of each day's business.[4] A new program will provide service for out-patient non-residents.[5] The MCC will be serviced by approximately 130 employees, only 90 of whom will be present on the premises at any one time.

In February 1972, appellants sought injunctive relief against construction of the MCC on the ground that GSA had failed to comply with the mandates of § 102 of NEPA, 42 U.S.C. § 4332(2)(C), which requires the preparation of a detailed environmental impact statement with respect to major federal actions "significantly affecting the quality of the human environment." On March 22, 1972, the application was denied by the district court on the ground that GSA had concluded that the Annex would not have such an effect and that its findings were not "arbitrary" within the meaning of § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Government concedes that construction of

---

4. See 18 U.S.C. §§ 4082, 3651, and 4201 for authorization of such programs.

5. See 18 U.S.C. §§ 4208(b), 5010(e), and 5034.

the Annex is a "major" federal action within the meaning of § 102 of NEPA.

Upon appeal this Court affirmed the district court's order as to the office building but reversed and remanded as to the detention center, the MCC, on the ground that the GSA's threshold determination, which had been set forth in a short memorandum entitled "Environmental Statement" dated February 23, 1971,[6] was too meager to satisfy NEPA's requirements. That statement confined itself to a brief evaluation of the availability of utilities, the adequacy of mass transportation, the removal of trash, the absence of a relocation problem and the intention to comply with existing zoning regulations. In remanding the case this Court, although finding the GSA statement sufficient to support its threshold determination with respect to the proposed office building, concluded that the detention center "stands on a different footing," *Hanly I* at 646, and that the agency was required to give attention to other factors that might affect human environment in the area, including the possibility of riots and disturbances in the jail which might expose neighbors to additional noise, the dangers of crime to which neighbors might be exposed as the consequence of housing an out-patient treatment center in the building, possible traffic and parking problems that might be increased by trucks delivering food and supplies and by vans taking prisoners to and from the Eastern District and New Jersey District Courts, and the need for parking space for prison personnel and accommodations for visitors, including lawyers or members of the family. This Court concluded:

> "The Act must be construed to include protection of the quality of life for city residents. Noise, traffic, over-burdened mass transportation systems, crime, congestion and even availability of drugs all affect the urban 'en-vironment' and are surely results of the 'profound influences of . . . high-density urbanization [and] industrial expansion.'" *Hanly I*, 460 F.2d at 647.

We further noted that in making the threshold determination authorized by § 102(2)(C) of NEPA the agency must "affirmatively develop a reviewable environmental record" in lieu of limiting itself to perfunctory conclusions with respect to the MCC. This Court granted the injunction as to the MCC but after consideration of the balance of hardships stayed the order for a period of 30 days to enable GSA to make a new threshold determination which would take into account the factors set forth in the opinion.[7]

Following the remand a new threshold determination in the form of a 25-page "Assessment of the Environmental Impact" ("Assessment" herein) was made by the GSA and submitted to the district court on June 15, 1972. This document (to which photographs, architect's renditions and a letter of approval from the Director of the Office of Lower Manhattan Development, City of New York, are attached) reflects a detailed consideration of numerous relevant factors. Among other things, it analyzes the size, exact location, and proposed use of the MCC; its design features, construction, and aesthetic relationship to its surroundings; the extent to which its occupants and activities conducted in it will be visible by the community; the estimated effects of its operation upon traffic, public transit and parking facilities; its approximate population, including detainees and employees; its effect on the level of noise, smoke, dirt, obnoxious odors, sewage and solid waste removal; and its energy demands. It also sets forth possible alternatives, concluding that there is none that is satisfactory. Upon the basis of this Assess-

---

6. The statement is quoted in full at 460 F.2d at 645–646.

7. On May 23, 1972, the district court enjoined further construction of the MCC until the GSA filed a revised threshold determination, but stayed such order until June 22, 1972. As the GSA did file its Assessment within the 30-day period, the injunction never did issue.

ment the Acting Commissioner of the Public Building Service Division of the GSA, who is the responsible official in charge, concluded on June 7, 1972, that the MCC was not an action significantly affecting the quality of the human environment.

On August 2, 1972, appellants renewed their application to Judge Tenney for a preliminary injunction, arguing that the Assessment failed to comply with this Court's direction in *Hanly I*, that it amounted to nothing more than a rewrite of the earlier statement that had been found inadequate, and that some of its findings were incorrect or insufficient. Appellants further demanded a consolidation of the motion for preliminary relief with a jury trial of the issues. On August 8, 1972, Judge Tenney, in a careful opinion, denied appellants' motions, from which the present appeal was taken.

### Discussion

■ At the outset we accept and agree with the decision of the *Hanly I* panel that the agency in charge of a proposed federal action (in this case the GSA) is the party authorized to make the threshold determination whether an action is one "significantly affecting the quality of the human environment" as that phrase is used in § 102(2)(C). Judge Feinberg, speaking for the panel in *Hanly I*, recognized this screening function of agencies in upholding GSA's determination that the proposed office portion of the Annex building did not require a detailed impact statement. *Hanly I*, 460 F.2d at 644. This interpretation comports with the general pattern of NEPA, which contemplates that with respect to each major federal action the responsible official of the federal agency

authorized to take the action is the person obligated to follow the "action-forcing" procedures prescribed by § 102(2)(C), and with guidelines issued by the Council on Environmental Quality (the "CEQ") and the GSA. See, e. g., Council on Environmental Quality, Guidelines, 36 Fed.Reg. 7724 (April 23, 1971); Implementation Procedures attached to GSA Order [PBS 1095.1A] issued December 2, 1971, by the Commissioner, Public Building Service, 1 Env.L.Rep. 46150–46152.[8] Accordingly we are satisfied that "GSA was the appropriate body to make the original determination as to environmental impact," *Hanly I*, 460 F.2d at 645.

■ We are next confronted with a question that was deferred in *Hanly I*— the standard of review that must be applied by us in reviewing GSA's action. The action involves both a question of law—the meaning of the word "significantly" in the statutory phrase "significantly affecting the quality of the human environment"—and a question of fact— whether the MCC will have a "significantly" adverse environmental impact. Strictly speaking, our function as a reviewing court is to determine *de novo* "all relevant questions of law," Administrative Procedure Act § 10(e), 5 U.S.C. § 706, see K. Davis, 4 Administrative Law Treatise § 29.01 (1958) (herein "Davis"), and, with respect to GSA's factual determinations, to abide by the Administrative Procedure Act, which limits us in matters not involving an agency's rule-making or adjudicatory function to determining whether its findings are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law," APA § 10

---

8. The interpretation is further supported by the Senate Report accompanying the proposed NEPA, which paraphrased the pertinent provision of § 102 as follows:

"(C) Each agency which proposes any major actions, such as project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs, shall make a determination as to whether the proposal would have a significant effect upon the quality of the human environment. If the proposal is considered to have such an effect, then the recommendation or report supporting the proposal must include statements by the responsible official of certain findings as follows: . . . ." S.Rep. 91–296, 91st Cong., 1st Sess. at 20.

(e), 5 U.S.C. § 706(2)(A) and (D); see Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971).

Where the court's interpretation of statutory language requires some appraisal of facts, a neat delineation of the legal issues for the purpose of substituted judicial analysis has sometimes proven to be impossible or, at least, inadvisable. Furthermore, in some cases a complete *de novo* analysis of the legal questions, though theoretically possible, may be undesirable for the reason that the agency's determination reflects the exercise of expertise not possessed by the court. See, e. g., Moog Industries, Inc. v. FTC, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958), where the Court declined to overturn the Commission's discretionary determination, stating:

> "It is clearly within the special competence of the Commission to *appraise the adverse effect on competition* that might result from postponing a particular order prohibiting continued violations of the law. Furthermore, the Commission alone is empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." 355 U.S. at 413, 78 S.Ct. at 379 (emphasis supplied).

Accordingly, with respect to review of such mixed questions of law and fact the Supreme Court has authorized a simpler, more practical standard, the "rational basis" test, whereby the agency's decision will be accepted where it has "warrant in the record" and a "reasonable basis in law." NLRB v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); see Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); 4 Davis §§ 29.01, 30.05 (1958).

Nothwithstanding the possible availability of the "rational basis" standard, we believe that the appropriate criterion in the present case is the "arbitrary, capricious" standard established by the Administrative Procedure Act, since the meaning of the term "significantly" as used in § 102(2)(C) of NEPA can be isolated as a question of law. This was the course taken by the district court[9] and is in accord with the Supreme Court's decision in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), where its review of the Department of Transportation's authorization of federal funds to finance construction of a highway through a federal park, turned on the meaning to be attributed to a statutory prohibition against such an authorization if "a feasible and prudent" alternative route exists. § 4(f) Dept. of Transportation Act of 1966, 49 U.S.C. § 1653(f) (1964 ed. Supp. V); § 18(a) of the Federal Aid Highway Act of 1968, 23 U.S.C. § 138 (1964 ed. Supp. V). Speaking for the Court, Justice Marshall declared that upon review the facts should be scrutinized to determine whether the agency decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" as required by the APA and whether the agency followed the necessary procedural requirements. We see no reason for application of a different approach here since the APA standard permits effective judicial scrutiny of agency action and concomitantly permits the agencies to have some leeway in applying the law

9. Views of other courts as to the standard of review of an agency's threshold determination of the necessity for an environmental impact statement under § 102 of NEPA have varied. See Citizens for Reid State Park v. Laird, 336 F.Supp. 783, 789 (D.Me.1972) (warrant in the record and a reasonable basis in law); Scherr v. Volpe, 336 F.Supp. 886, 888 (W.D. Wis.1971), affd., 466 F.2d 1027 (7th Cir. 1972) (de novo review); Goose Hollow Foothills League v. Romney, 334 F. Supp. 877 (D.Ore.1971) (arbitrary, capricious); Echo Park Residents Committee v. Romney, 2 Env.L.Rep. 20337 (C.D. Calif.1971) (arbitrary); Save Our Ten Acres v. Kreger, 2 Env.L.Rep. 20305, 20307 (S.D.Ala.1972) ("arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

to factual contexts in which they possess expertise. Accordingly we conclude that the applicable scope of review of an agency's threshold determination that an impact statement is not required under § 102 of NEPA is the "arbitrary, capricious, abuse of discretion" standard. See, e. g., Echo Park Residents Committee ·v. Romney, 3 E.R.C. 1255 (C.D.Calif. 1971).

■ Upon attempting, according to the foregoing standard, to interpret the amorphous term "significantly," as it is used in § 102(2)(C), we are faced with the fact that almost every major federal action, no matter how limited in scope, has *some* adverse effect on the human environment. It is equally clear that an action which is environmentally important to one neighbor may be of no consequence to another. Congress could have decided that every major federal action must therefore be the subject of a detailed impact statement prepared according to the procedure prescribed by § 102(2)(C). By adding the word "significantly," however, it demonstrated that before the agency in charge triggered that procedure, it should conclude that a greater environmental impact would result than from "any major federal action." Yet the limits of the key term have not been adequately defined by Congress or by guidelines issued by the CEQ and other responsible federal agencies vested with broad discretionary powers under NEPA. Congress apparently was willing to depend principally upon the agency's good faith determination as to what conduct would be sufficiently serious from an ecological standpoint to require use of the full-scale procedure.

Guidelines issued by the CEQ, which are echoed in rules for implementation published by the Public Buildings Service, the branch of GSA concerned with the construction of the MCC, suggest that a formal impact statement should be prepared with respect to "proposed actions, the environmental impact of which is likely to be highly controversial." See Council on Environmental Quality, Statements on Proposed Federal Actions Affecting the Environment, Guidelines § 5(b), 36 Fed.Reg. 7724 (April 23, 1971); Public Buildings Service, Environmental Statements, Attachments § 1a(5) (Dec. 2, 1971), 1 Env.L. Rep. 46151. However, the term "controversial" apparently refers to cases where a substantial dispute exists as to the size, nature or effect of the major federal action rather than to the existence of opposition to a use, the effect of which is relatively undisputed. This Court in *Hanly I*, for instance, did not require a formal impact statement with respect to the office building portion of the Annex despite the existence of neighborhood opposition to it. The suggestion that "controversial" must be equated with neighborhood opposition has also been rejected by others. See Citizens for Reid State Park v. Laird, 336 F.Supp. 783 (D.Me.1972).[9A]

■ In the absence of any Congressional or administrative interpretation of the term, we are persuaded that in deciding whether a major federal action will "significantly" affect the quality of the human environment the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including

---

[9A]. To require an impact statement whenever a threshold determination dispensing with one is likely to face a court challenge, as the dissent suggests, would surrender the determination to opponents of a major federal action, no matter how ꞌnsignificant its environmental effect

when viewed objectively. Experience in local zoning disputes demonstrates that it is the rare case where some neighbors do not oppose a project, no matter how beneficial, and that their opposition is usually accompanied by threats of litigation.

the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. Where conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change. Absent some showing that an entire neighborhood is in the process of redevelopment, its existing environment, though frequently below an ideal standard, represents a norm that cannot be ignored. For instance, one more highway in an area honeycombed with roads usually has less of an adverse impact than if it were constructed through a roadless public park. See, e. g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Although the existing environment of the area which is the site of a major federal action constitutes one criterion to be considered, it must be recognized that even a slight increase in adverse conditions that form an existing environmental milieu may sometimes threaten harm that is significant. One more factory polluting air and water in an area zoned for industrial use may represent the straw that breaks the back of the environmental camel. Hence the absolute, as well as comparative, effects of a major federal action must be considered.

Chief Judge Friendly's thoughtful dissent, while conceding that we (and governmental agencies) face a difficult problem in determining the meaning of the vague and amorphous term "significantly" as used in § 102(2)(C), offers no solution other than to suggest that an impact statement should be required whenever a major federal action might be "arguably" or "potentially" significant and that such an interpretation would insure the preparation of impact statements except in cases of "true" insignificance. In our view this suggestion merely substitutes one form of semantical vagueness for another. By failure to use more precise standards it would leave the agency, which admittedly must make the determination, in the very

quandary faced in this case and only serve to prolong and proliferate uncertainty as to when a threshold determination should be accepted. The problem is not resolved by use of terms as "obviously insignificant," "minor," "arguably significant," a "fairly arguable" adverse impact, or the like, or by reference to "grey" areas or characterization of our opinion as "raising the floor" to permit agencies to escape an impact statement.

We agree with Chief Judge Friendly that an impact statement should not be required where the impact will be minor or unimportant, or where "there is no sensible reason for making one," and that such a statement should be required where the action may fairly be said to have a potentially significant adverse effect. But these conclusions merely pose the problem which cannot be solved by an interchange of adjectives. In our view such a morass can be avoided only by formulation of more precise factors that must be considered in making the essential threshold determination. This we have attempted to do.

In the absence of such standards we cannot agree that construction of a proposed office building of the type forming part of the Annex would be "obviously insignificant" and hence would not require an impact statement. An office building or, indeed, a jail, may have an adverse impact in an area where such use does not exist and is not permitted by zoning laws (e. g., Park Avenue and 72nd Sreet) whereas the contrary would hold in a location where such uses do exist and are authorized by such laws (e. g., the location of the MCC). See Goose Hollow Foothills League v. Romney, 334 F.Supp. 877 (D.Ore.1971) (setting aside threshold determination that high-rise building would not significantly affect environment where no weight had been given to fact that it would change character of neighborhood and concentrate population in the neighborhood). Rather than encourage agencies to dispense with impact statements, we believe that application of the foregoing

objective standards, coupled with compliance with minimum procedural requirements (specified below), which are designed to assure consideration of relevant facts, will lead agencies in doubtful cases (so-called "grey" areas) to obtain impact statements rather than to risk the delay and expense of protracted litigation.

Although this Court in *Hanly I* did not expressly articulate the standards we have used, its decision that the proposed office building portion of the Annex would not be environmentally significant conforms to the rationale. The office building would not differ substantially from the makeup of the surrounding area. Nor would it in absolute terms give rise to sizeable adverse environmental effects. Most of the employees occupying the building would merely be transferred from the existing Courthouse where the newly created space will be used primarily for courtrooms and desperately needed office space for court personnel. On the other hand, the proposed jail, for reasons set forth in detail in *Hanly I*, might have adverse effects differing both qualitatively and quantitatively from those associated with existing uses in the area. Moreover there was insufficient evidence that the absolute environmental effect with respect to the jail had been analyzed and considered by the GSA. Thus the matter was remanded for reappraisal. Now that the GSA has made and submitted its redetermination in the form of a 25-page "Assessment," our task is to determine (1) whether it satisfies the foregoing tests as to environmental significance, and (2) whether GSA, in making its assessment and determination, has observed "procedure required by law" as that term is used in § 10 of the APA, 5 U.S.C. § 706(2)(D).

The Assessment closely parallels in form a detailed impact statement. The GSA's finding that the MCC would harmonize architecturally with existing buildings in the area, and even enhance the appearance of the neighborhood, is supported by details of the proposed building, architectural renditions, and photographs of the area. The facade of the MCC and of the Annex office building are designed to reflect the first cornice height of the Municipal Building, a prominent architectural feature of both the United States Courthouse and the New York Supreme Court, and to blend closely in appearance and geometry with the surrounding buildings, including the newly constructed New York City Police Headquarters. The windows, which will be glazed with unbreakable polycarbonate plastic shatter-proof sheets will be recessed and will be of a dark gray color designed to insulate the community from visual contact with the detainees. Moreover, there will be no fortress walls or unsightly steel-barred windows, cf. Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971). In short, the building will not look like a correctional center.

The Assessment further describes efforts that will be made to minimize any contact between detainees and members of the community. In addition to the recessed, darkened windows, all prisoners will enter the building through an entrance on Cardinal Hayes Place, located on the side opposite from and out of view of neighborhood residental apartments. Although there will be a roof-top recreational area for detainees, a 20-foot wall will minimize their visibility from the apartments.

The Assessment further notes that any increase in traffic from MCC will be extremely slight. One van will take and return detainees on one daily round trip during weekdays to the Eastern District Courthouse and to the Newark District Courthouse. However, this traffic will be offset by the fact that two vans currently used to bring prisoners from West Street to the Courthouse in Foley Square daily will be eliminated since these prisoners will be transported from the MCC across enclosed bridges connecting it with the Courthouse.

Visiting hours at the MCC will be permitted between 8:00 A.M. and 4:00 P.M. and between 7:00 P.M. and 9:00 P.M. The GSA Assessment projected on

the basis of past experience that approximately 130 visitors will arrive per day with no more than 20 on the premises at any one time. This would not impose any excessive burden on mass transportation facilities, which are nearby, numerous and include several subway lines and bus routes described in detail. In addition to limited parking during the day on certain nearby streets, there are at least six garages or lots available for parking in the area, also identified by location and capacity. There will be only four truck deliveries of supplies per day to the premises.

The windows of the MCC are designed to minimize any noise from within the premises, in addition to which detainees will be under constant supervision when outside on the roof-top for recreational purposes. During the past five years there have been only two small inside disturbances at the present detention facility at West Street, Manhattan, and three outside disturbances, the latter confined to non-violent picketing, marching and the like, incidents which have been common occurrence in the Foley Square area during the same period.

The Assessment makes clear that the MCC will not produce any unusual or excessive amounts of smoke, dirt, obnoxious odors, solid waste, or other forms of pollution. The utilities required to heat and air-condition the building are readily available and the MCC is designed to incorporate energy-saving features, so that no excessive power demands are posed. The GSA further represents that the building will conform to all local codes, use and zoning, and attaches a letter from the New York City Office of Lower Manhattan Development dated August 4, 1971, indicating approval of the Annex, which includes the MCC.

Appellants contend that the Assessment is merely a "rewrite" of GSA's earlier February 23, 1971 "Environmental Statement" found inadequate in *Hanly I,* and that GSA has failed to take into consideration certain adverse facts. A comparison of the 25-page detailed Assessment with the earlier statement reveals that the former is far more than a "rewrite" and that it furnishes detailed findings with respect to most of the relevant factors unmentioned in the earlier statement. On its face the Assessment indicates that GSA has redetermined the environmental impact of the MCC with care and thoroughness. In the absence of contrary factual proof, we would have no hesitancy in upholding it, whether it is reviewed by the "arbitrary, capricious" standard or the "rational basis" test. Judged by the comparative uses in the area and according to its quantitative environmental effects, the MCC should not have a significant effect upon the human environment.

Appellants offer little or no evidence to contradict the detailed facts found by the GSA. For the most part their opposition is based upon a psychological distaste for having a jail located so close to residential apartments, which is understandable enough. It is doubtful whether psychological and sociological effects upon neighbors constitute the type of factors that may be considered in making such a determination since they do not lend themselves to measurement.[10] However we need not decide that issue because these apartments were constructed within two or three blocks of another existing jail, The Manhattan House of Detention for Men, which is much larger than the proposed MCC and houses approximately 1,200 prisoners.[11] Furthermore the area in which the MCC is located has at all times been zoned by the City of New York as a commercial district designed to provide for a wide range of uses, *specifically including "Prisons."* [12]

10. Unlike factors such as noise, which can be related to decibels and units which measure duration, or crime, in which crime statistics are available, psychological factors are not readily translatable into concrete measuring rods.

11. See Rhem v. McGrath, 326 F.Supp. 681, 688 (S.D.N.Y.1971).

12. The MCC is located in a C6—General Central Commercial District which is "designed to provide for the wide range

■ Despite the GSA's scrupulous efforts the appellants do present one or two factual issues that merit further consideration and findings by the GSA. One bears on the possibility that the MCC will substantially increase the risk of crime in the immediate area, a relevant factor as to which the Assessment fails to make an outright finding despite the direction to do so in *Hanly I*. Appellants urge that the Community Treatment Program [13] and the program for observation and study of non-resident out-patients [14] will endanger the health and safety of the immediate area by exposing neighbors and passersby to drug addicts visiting the MCC for drug maintenance and to drug pushers and hangers-on who would inevitably frequent the vicinity of a drug maintenance center. If the MCC were to be used as a drug treatment center, the potential increase in crime might tip the scales in favor of a mandatory detailed impact statement. The Government has assured us by post-argument letter addressed to the Court that:

"Neither the anticipated nonresident pre-sentence study program nor any program to be conducted within the Metropolitan Correction Center will include drug maintenance."

While we do not question the Government's good faith, a finding in the matter by GSA is essential, since the Assessment is ambiguous as to the scope of the non-resident out-patient observation program and makes no finding on the subject of whether the MCC will increase the risk of crime in the community.[15] In addition one of the appellants, Sien Wei Liu, has furnished to the district court an affidavit taking issue with certain facts found by the GSA, including the visibility of the jail's rear entrance from nearby apartment buildings, the distance of the MCC from the closest apartment, the possible use of nearby overcrowded community medical facilities by prisoners, and the claim that certain city officials are opposed to the location of the MCC.

■ Appellants further contend that they have never been given an opportunity to discuss the MCC with any governmental agency prior to GSA's submission of its Assessment, which raises the question whether the agency acted "without observance of procedure required by law," see Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). We do not share the Government's view that the procedural mandates of § 102(A), (B), and (D), 42 U.S.C. § 4332(2)(A), (B) and (D), apply only to actions found by the agency itself to have a significant environmental effect.[16] While these sections are somewhat opaque, they are not expressly limited to "major Federal actions significantly affecting the quality of the human environment." Indeed if they were so limited § 102(D), which requires the agency to develop appropriate

---

of retail, office, amusement, service, custom manufacturing, and related uses normally found in the central business district, but to exclude non-retail uses which generate a large volume of business." City of New York, Zoning Maps and Resolutions 102 (1967). Among the uses specifically permitted are prisons. *Id.* at Appendix A, A–15 (1968).

13. See note 4 and accompanying text *supra*.

14. See note 5 and accompanying text *supra*.

15. If the Government should later change the use of the premises to include a drug treatment center, or any other change that might significantly affect the quali-

ty of the human environment, then a detailed § 102(C) impact statement would be required at that time. See Council on Environmental Quality, Guidelines § 11, 36 Fed.Reg. 7724, 7727 (April 23, 1971); Public Buildings Service, Environmental Statements, Attachment B, § 1b(5) (Dec. 2, 1971), 1 Env.L.Rep. 46150, 46151.

16. This Court in *Hanly I* left open the question whether subsections (A), (B) and (D) of § 102(2), 42 U.S.C. § 4332(2) (A), (B) and (D) are applicable even when no § 102(2)(C) environmental impact statement was required and even if they were applicable whether the GSA had in substance complied. 460 F.2d at 649.

alternatives to the recommended course of action, would be duplicative since § 102(C), which does apply to actions "significantly affecting" the environment, specifies that the detailed impact statement must deal with "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). However, in our view the Assessment does, in fact, satisfy the requirement of § 102(2)(A) that an interdisciplinary approach taking into account the "natural and social sciences and the environmental design arts" be used. The GSA has retained architects familiar with the design requirements of the Civic Center and consulted with the Office of Lower Manhattan Development in an effort to harmonize the MCC with the Civic Center. The Assessment scrupulously takes into account the aesthetics and the tangible factors involved in the designing and planning of the MCC. Furthermore we find that § 102(2)(D) was complied with insofar as the GSA specifically considered the alternatives to continuing operation at the present facility at West Street and evaluated the selected site as compared with other specified possibilities. Although the assessment of the alternative sites was not as intensive as we might hope, its failure to analyze them in further detail does not warrant reversal.[17]

██ A more serious question is raised by the GSA's failure to comply with § 102(2)(B), which requires the agency to "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations." 42 U.S.C. § 4332(2)(B). Since an agency, in making a threshold determination as to the "significance" of an action, is called upon to review in a general fashion the same

factors that would be studied in depth for preparation of a detailed environmental impact statement, § 102(2)(B) requires that some rudimentary procedures be designed to assure a fair and informed preliminary decision. Otherwise the agency, lacking essential information, might frustrate the purpose of NEPA by a threshold determination that an impact statement is unnecessary. Furthermore, an adequate record serves to preclude later changes in use without consideration of their environmental significance as required by NEPA.[18]

Where a proposed major federal action may affect the sensibilities of a neighborhood, the prudent course would be for the agency in charge, before making a threshold decision, to give notice to the community of the contemplated action and to accept all pertinent information proffered by concerned citizens with respect to it. Furthermore, in line with the procedure usually followed in zoning disputes, particularly where emotions are likely to be aroused by fears, or rumors of misinformation, a public hearing serves the dual purpose of enabling the agency to obtain all relevant data and to satisfy the community that its views are being considered. However, neither NEPA nor any other federal statute mandates the specific type of procedure to be followed by federal agencies. There is no statutory requirement that a public hearing be held before a site for a house of detention is selected by the Attorney General or construction of the facility is undertaken by the GSA. See 18 U.S.C. § 4003, 40 U.S.C. §§ 602–606. Although the Guidelines issued by the CEQ suggest that agencies "shall include, whenever appropriate, provision for public hearings, and shall provide the public with relevant information, including information on alternative courses of action," Council on Environmental

---

17. But see the guidelines of the Public Buildings Service which suggests that § 102(2)(D) impels "[a] rigorous exploration and objective evaluation of possible alternative actions that might avoid some or all of the adverse environmental

effects. . . ." Public Buildings Service, Environmental Statements, Attachment B, § 5c(5) (Dec. 2, 1971), 1 Env.L.Rep. 46150, 46151.

18. See note 15, supra.

Quality, Statements on Proposed Federal Actions Affecting the Environment, Guidelines § 10(e), 36 Fed.Reg. 7724, 7726 (April 23, 1971), these provisions apply only to the procedure for preparation of detailed impact statements *after* the preliminary determination of significance has been made.

■ Notwithstanding the absence of statutory or administrative provisions on the subject, this Court has already held in *Hanly I* at 647 that federal agencies must "affirmatively develop a reviewable environmental record . . . even for purposes of a threshold section 102 (2)(C) determination." We now go further and hold that before a preliminary or threshold determination of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision. We do not suggest that a full-fledged formal hearing must be provided before each such determination is made, although it should be apparent that in many cases such a hearing would be advisable for reasons already indicated. The necessity for a hearing will depend greatly upon the circumstances surrounding the particular proposed action and upon the likelihood that a hearing will be more effective than other methods in developing relevant information and an understanding of the proposed action. The precise procedural steps to be adopted are better left to the agency, which should be in a better position than the court to determine whether solution of the problems faced with respect to a specific major federal action can better be achieved through a hearing or by informal acceptance of relevant data.

■ In view of the Assessment's failure to make findings with respect to the possible existence of a drug maintenance program at the MCC, the increased risk of crime that might result from the operation of the MCC, and the fact that appellants have challenged certain findings of fact, we remand the case

for the purpose of requiring the GSA to make a further investigation of these issues, with directions to accept from appellants and other concerned citizens such further evidence as they may proffer within a reasonable period, to make supplemental findings with respect to these issues, and to redetermine whether the MCC "significantly affects the quality of the human environment". If, as a result of such further investigation, the GSA concludes that a detailed environmental impact statement is required, a preliminary injunction will be granted restraining further construction of the MCC until the agency has complied with the procedures required by § 102(2)(C) of NEPA. In the event that the GSA reaffirms its initial determination, the district court will determine, should a further request be made, whether preliminary injunctive relief is warranted.

With the aid of hindsight we recognize, as does the dissent, that a further Assessment, when added to the time and expense already incurred, will prolong the final determination far beyond the time that would have been required if the energies of the GSA had been directed initially toward the preparation of an impact statement. However, important issues have been presented and there is no suggestion of bad faith or deliberate delay on the part of anyone. Indeed if the need for an impact statement had been obvious, this Court in *Hanly I* would hardly have accepted the initial determination with respect to the office building portion of the Annex and remanded the case for a further determination as to the MCC.

The case is remanded for further proceedings not inconsistent with this opinion. The mandate shall issue forthwith.

FRIENDLY, Chief Judge (dissenting):

The learned opinion of my brother MANSFIELD gives these plaintiffs, and environmental advocates in future cases, both too little and too much. It gives too little because it raises the floor of

what constitutes "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332 (2)(C), higher than I believe Congress intended. It gives too much because it requires that before making a threshold determination that no impact statement is demanded, the agency must go through procedures which I think are needed only when an impact statement must be made. The upshot is that a threshold determination that a proposal does not constitute major Federal action significantly affecting the quality of the human environment becomes a kind of mini-impact statement. The preparation of such a statement under the conditions laid down by the majority is unduly burdensome when the action is truly minor or insignificant. On the other hand, there is a danger that if the threshold determination is this elaborate, it may come to replace the impact statement in the grey area between actions which, though "major" in a monetary sense, are obviously insignificant (such as the construction of the proposed office building) and actions that are obviously significant (such as the construction of an atomic power plant). We would better serve the purposes of Congress by keeping the threshold low enough to insure that impact statements are prepared for actions in this grey area and thus to permit the determination that no statement is required to be made quite informally in cases of true insignificance.

While I agree that determination of the meaning of "significant" is a question of law, one must add immediately that to make this determination on the basis of the dictionary would be impossible. Although all words may be "chameleons, which reflect the color of their environment," C. I. R. v. National Carbide Corp., 167 F.2d 304, 306 (2 Cir. 1948) (L. Hand, J.), "significant" has that quality more than most. It covers a spectrum ranging from "not trivial" through "appreciable" to "important" and even "momentous". If the right meaning is at the lower end of the spectrum, the construction of the MCC comes within it; *per contra* if the meaning is at the higher end.

The scheme of the National Environmental Policy Act argues for giving "significant" a reading which places it toward the lower end of the spectrum. The statute's objectives, 42 U.S.C. § 4321, were "To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; [and] to promote efforts which will prevent or eliminate damage to the environment . . . ." Section 4332 outlines methods designed to insure that "the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the[se] policies." Most of its provisions are hortatory; the only one with teeth is the mandate in subdivision (2)(C) that each agency must "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement . . . " covering the five items listed in that section, one of which is described in subdivision (D) at greater length. Subdivision (C) also outlines formalized procedures designed to insure that the expertise, knowledge and interest of Federal, State and local agencies, of the public, and of the Council on Environmental Quality (CEQ) are brought to bear on such statements. These have been fleshed out by the CEQ's Guidelines, notably § 10(e), 36 Fed.Reg. 1726 (1971), directing the agencies to develop procedures for the preparation of impact statements which "shall include, whenever appropriate, provision for public hearings."

It is not readily conceivable that Congress meant to allow agencies to avoid this central requirement by reading "significant" to mean only "important," "momentous," or the like. One of the purposes of the impact statement is to insure that the relevant environmental data are before the agency and considered by it prior to the decision to commit Federal resources to the project; the statute must not be construed so as to al-

low the agency to make its decision in a doubtful case without the relevant data or a detailed study of it. This is particularly clear because of the absence from the statute of any procedural requirement upon an agency in making the threshold determination that an impact statement is not demanded, although the majority has managed to contrive one.[1] What Congress was trying to say was "You don't need to make an impact statement, with the consequent expense and delay, when there is no sensible reason for making one." I thus agree with Judge J. Skelly Wright's view that "a statement is required whenever the action *arguably* will have an adverse environmental impact," Students Challenging Regulatory Agency Procedures (S.C. R.A.P.) v. United States, 346 F.Supp. 189, 201 (D.D.C.1972) (three-judge court) (emphasis in original), prob. juris. noted, 409 U.S. 1073, 93 S.Ct. 683, 34 L.Ed.2d 662, with the qualification, doubtless intended, that the matter must be *fairly* arguable. This qualification reconciles the S.C.R.A.P. holding with Judge Gignoux' opinion in Citizens for Reid State Park v. Laird, 336 F.Supp. 783 (D.Me.1972).

Beyond the general scheme of the legislation, a court normally looks for guidance, in the case of a statute calling for administrative action, to the views of those charged with its administration. See Griggs v. Duke Power Co., 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). However, this does not mean that dominating weight should be given to the views of agencies upon whom NEPA placed a duty to make impact statements when the result would be to relieve them from that obligation—particularly when these are "action" agencies like the GSA. The National Environmental Policy Act established its own watch-dog agency, The Council on Environmental Quality. The CEQ Guidelines lend additional support to the conclusion that the threshold determination of significance must be set at a low level. They provide that "if there is *potential* that the environment may be significantly affected, the statement is to be prepared." Guidelines § 5(b), 36 Fed.Reg. 7724 (1971) (emphasis added). And they state further, in a remark highly relevant to this case:

> Proposed actions, the environmental impact of which is likely to be highly controversial, should be covered in all cases.

*Id.* This Guideline has been expressly adopted by the GSA in its own regulations, GSA Public Buildings Service Order 1095.1A, Attachment B, § 1(a)(5) (Dec. 2, 1971). With respect, I see no basis for reading this as limited to cases where there is a dispute over what the environmental effects actually will be. Rather, I would think it clear that this includes action which the agency should

---

[1]. The majority apparently construes the earlier opinion in this case, Hanly v. Mitchell, 460 F.2d 640, 647 (2 Cir. 1972), as holding that some procedures for public participation are required before making a threshold assessment that no impact statement is required. I cannot agree. The full statement in the opinion was:

> But in the context of an act designed to require federal agencies to affirmatively develop a reviewable environmental record, this perfunctory and conclusory language simply does not suffice, even for purposes of a threshold section 102 (2)(C) determination.

What the court was saying was that "in the context of an act designed to require federal agencies to affirmatively develop a reviewable environmental record" *by preparing an impact statement*, the agency could not escape the duty of making one, at least in an arguable case, by "perfunctory and conclusory language." This is a long way from dictating any procedure for public participation in threshold determinations. The discussion in 460 F.2d at 648–649 affords further evidence that the earlier panel did not think there need be public participation before the GSA prepared a revised assessment. In any event, the statute is so clear on this point that I would feel constrained not to follow any contrary dictum, if dictum there were.

know is likely to arouse intense opposition, even if the actual environmental impact is readily apparent. Apart from the former being the natural meaning of the words, the CEQ may well have had in mind that when action having some environmental impact "is likely to be highly controversial," an agency assessment that the action does not constitute major Federal action significantly affecting the environment is almost certain to evoke challenge in the courts. The CEQ could well have believed that rather than to incur the delay incident to such a suit, and the further delay if a court sustains the challenge—both vividly illustrated in this case where nearly two years have elapsed since the initial assessment that an impact statement was not required and a further remand is being directed— the agency would do better to prepare an impact statement in the first instance.[2] In addition to possibly providing new information making reconsideration or modification of the project appropriate, such a policy has the added benefits of allowing opponents to blow off steam and giving them the sense that their objections have been considered— an important purpose of NEPA, as it is of the British statutory inquiry. See Wade, Administrative Law, ch. 6 (3d ed. 1971). The Guidelines thus reinforce my belief that the scheme of the statute requires us to confine "significantly" to the lower range of the spectrum which that word covers.

I thus reach the question whether, with the term so narrowed, the GSA's refusal to prepare an impact statement for the MCC can be supported. Accepting the majority's standard of review, I would think that, even with the fuller assessment here before us, the GSA could not reasonably conclude that the MCC does not entail potentially significant environmental effects. I see no ground for the majority's doubt "whether psychological and sociological effects upon neighbors constitute the type of factors that may be considered in making such a determination [of significant environmental effect] since they do not lend themselves to measurement." The statute speaks of "the overall welfare and development of man," 42 U.S.C. § 4331 (a) and makes it the responsibility of Federal agencies to "use all practicable means . . . to . . . assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." *Id.* § 4331(b)(2). Moreover, § 4332(2)(B) directs that "presently unquantified environmental amenities and values . . . be given appropriate consideration in decisionmaking along with economic and technical considerations." I cannot believe my brothers would entertain the same doubt concerning the relevance of psychological and sociological factors if a building like the MCC were to be constructed at Park Avenue and East 72nd Street, assuming that zoning allowed it. While the fact that the area here in question contains many office buildings justified this court's previous conclusion that construction of the building to house the United States Attorney and other federal officials would not significantly affect the environment, 460 F.2d at 646, it does not support a similar conclusion with respect to a jail. Although there is a larger New York City jail in the neighborhood, a glance from our own windows will show that it must be nearly or wholly invisible to the 3,000 persons living in the two large cooperative apartments, Chatham Towers and Chatham Green, which "directly face the proposed new jail, some 100–150 feet away." 460 F.2d at 642. The effect, at least on these people, is thus wholly diferent from the unseen New York City jail several blocks away. Finally, I do not perceive how the expedient devised by the majority to

---

2. The limitation in the Guideline, "which is *likely* to be *highly controversial*" (emphasis supplied), answers the majority's fear that following the Guideline would

"surrender the determination to opponents of a major federal action, no matter how insignificant its environmental effect when viewed objectively."

deal with appellants' arguments relating to the Community Treatment Program and the program for observation and study of non-resident out-patients really meets their points. While I assume that the Government's present intentions with respect to these programs are as limited as it has stated, these may be altered with the passage of time. I see nothing in NEPA that would require a new impact statement if the programs should be augmented as the years pass. This is why, as previously stated, the Guidelines recommend that "if there is *potential* that the environment may be significantly affected, the statement is to be prepared." (Emphasis supplied.)

I do not mean anything said in this opinion to imply that GSA will be unable to conclude in an impact statement that construction of the MCC is justified. Furthermore, as I have suggested in another case, "Once it is determined in any particular instance that there has been good faith compliance with those procedures [of NEPA], we seriously question whether much remains for a reviewing court." City of New York v. United States (II), 344 F.Supp. 929, 940 (E.D. N.Y.1972); see also Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971); Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 838 (D.C.Cir.1972); A. W. Murphy, The National Environmental Policy Act and the Licensing Process: Environmental Magna Carta or Agency Coup de Grace, 72 Colum.L.Rev. 963, 1006–07 (1972). However, as said in City of New York v. United States (I), 337 F.Supp. 150, 160 (E.D.N.Y.1972):

> To permit an agency to ignore its duties under NEPA with impunity because we have serious doubts that its ultimate decision will be affected by compliance would subvert the very purpose of the Act and encourage further administrative laxity in this area.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New

The energies my brothers would require GSA to devote to still a third assessment designed to show that an impact statement is not needed would better be devoted to making one.

I would reverse and direct the issuance of an injunction until a reasonable period after the making of an impact statement.