**SIERRA CLUB, a non-profit California Corporation, Plaintiff,**

v.

**Gordon CAVANAUGH, Individually and as Administrator, Farmers Home Administration, Jack Weiland, Individually and as South Dakota Director of Farmers Home Administration, Ronald L. Walker, Individually and as Secretary, Department of Agriculture of the United States, Minnehaha Community Water, Corp., a non-profit South Dakota Corporation, and South Lincoln Rural Water System, Inc., a non-profit South Dakota Corporation, Oak Trails, Inc., a corporation, Donald M. Frost and Gene Jones, dba F & J Enterprises, Robert W. Farrell, Ardel Prather, Leonard E. Shager and Lorna M. Shafer, Merrill Anderson and Joyce Anderson, Arther P. Rollinger and Marlene L. Rollinger, Defendants.**

No. CIV 77–4070.

United States District Court,
D. South Dakota, S. D.

March 23, 1978.

John N. Gridley III, Sioux Falls, S. D., and H. Anthony Ruckel and William H. Haring, Denver, Colo., for plaintiff.

Robert D. Hiaring, Asst. U. S. Atty., Sioux Falls, S. D., for defendants Cavanaugh, Weiland and Walker.

Richard F. Staley, Sioux Falls, S. D., for defendant Minnehaha Community Water, Corp.

Eugene J. Irons and Jeff Masten, Canton, S. D., for defendant South Lincoln Rural Water System, Inc.

Richard O. Gregerson, of Woods, Fuller, Shultz & Smith, Sioux Falls, S. D. for defendants Oak Trails, Inc., Frost, Jones, Farrell, Prather, Shafers, Andersons and Rollingers.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This is an action by the Sierra Club, brought pursuant to the National Environmental Policy Act, 42 U.S.C. section 4321 et seq. (NEPA). The Sierra Club seeks to enjoin further construction of and hook-up to two rural water systems until an envi-

ronmental impact statement, (EIS), is prepared on each project.

The defendants include various federal agencies and their administrators, real estate developers and the two water systems, Minnehaha Community Water, Corp., and South Lincoln Rural Water System. Although the technical features of the two systems are similar and the Sierra Club claims both will cause the same adverse environmental impacts, the facts surrounding the two systems are sufficiently distinct to merit separate consideration.

## MINNEHAHA COMMUNITY WATER, CORP.

The Minnehaha Community Water, Corp., (MCWC), is a rural water system designed to serve the rural residents of Minnehaha County and several small communities of Minnehaha County. The system is financed by a loan from the Farmers Home Administration. The MCWC has a capacity of 1800 to 2000 individual users. Presently, 1550 individual users have subscribed. Bulk users have subscribed for an additional 400 individual hook-ups to the system. The bulk users are municipalities and subdivision developers who have paid the subscription fee to have the system installed to their property. The bulk subscriber, at his own expense, then completes the installation of the system at his development.

It is the ability of the bulk users to subscribe to the MCWC which the Sierra Club claims will create widespread environmental consequences such as water shortages, a reduction in water quality, the stimulation of unplanned urban sprawl, and the consumption of prime agricultural lands. The Sierra Club claims these impacts will significantly affect the environment and therefore NEPA requires the preparation of an EIS. The defendants claim the Sierra Club's action against MCWC is barred by the doctrine of laches.

■ Although the doctrine of laches has received a lukewarm reception in environmental litigation, where appropriate, it is applicable. *Save Our Wetlands v. U. S. Army Corps of Engineers*, 549 F.2d 1021,

1026 (5th Cir.1977); *Minnesota Public Interest Research Group (MPIRG) v. Butz*, 498 F.2d 1314, 1324 (8th Cir.1974); *Lathan v. Volpe*, 455 F.2d 111 (9th Cir.1971).

■ There are three criteria which must be met before laches can be applied. The defendants must show: (1) a delay in asserting a right or claim; (2) the delay was not excusable; and (3) there was undue prejudice to the defendants as a result of the delay. *Save Our Wetlands, supra* at 1026; *Nolop v. Volpe*, 333 F.Supp. 1364, 1367 (D.S.D.1971).

### The Delay

■ The present action was filed on July 25, 1977. However, efforts to develop interest in and support for a rural water system in Minnehaha County began in 1971 with mailings to all Minnehaha County residents. In 1972, a steering committee was formed which held regular public meetings. The steering committee solicited subscribers through the use of numerous press releases in area newspapers and magazines. Local radio and television stations also provided coverage of the activities of the steering committee. Sign-up efforts, coupled with mailings and press coverage, have continued since 1972.

On March 5, 1973, an environmental impact assessment, (EIA), was prepared by the Farmers Home Administration which concluded that an EIS was not required by NEPA. In June of 1973, tentative funding for MCWC was approved by the Farmers Home Administration.

Efforts to obtain more subscribers continued through 1973 and 1974 with attendant publicity. In 1974 a water source was located and MCWC began obtaining easements. In late 1975 bids were let and in early 1976 contracts were awarded. Construction began in April of 1976. By the time the suit was filed in July of 1977, the MCWC was 93% completed.

### The Delay Was Inexcusable

The Sierra Club contends it became aware of the nature and character of the

users and the nature of the potentially adverse environmental impacts in early 1976. However, the project received widespread publicity since its inception in 1971. If the Sierra Club had been reasonably diligent, it would have discovered any potentially adverse impacts at a much earlier date.

The Dacotah Chapter of the Sierra Club, which includes members of the Sierra Club who initiated this action, was formed in July of 1975. Two members of the Dacotah Chapter who testified at trial are employed by the largest city in Minnehaha County, Sioux Falls, as urban planners. A third member was a city commissioner and the head of the Water Department of the City of Sioux Falls when the MCWC was formed. Therefore, they are somewhat knowledgeable in the area of water resource development and the causes and effects of urban sprawl. It is inexcusable that they did not adequately inform or concern themselves with the consequences of a proposed major federal action on their areas of expertise prior to 1976. Furthermore, to delay taking legal action until July of 1977 is inexcusable given their admission that they were aware of the MCWC in early 1976. Although there is a natural reluctance to impose the doctrine of laches on an uninformed group of individuals, that does not apply here where several members of the Dacotah Chapter of the Sierra Club are knowledgeable and have a degree of expertise in the nature of the adverse environmental impacts they claim will flow from the MCWC. *See, Iowa Student Public Interest Research Group v. Callaway,* 379 F.Supp. 714, 721 (S.D.Iowa 1974).

### The Delay Was Prejudicial

During the time which the Sierra Club admits it had knowledge of the impacts of the MCWC, bids were let and awarded and construction began. At the present time, the project is 93% complete.[1] It would not be economically feasible to alter the project at this stage. Further, the third party intervenors, the developers, have paid $136,692.00 to MCWC in reliance upon MCWC supplying water to the various development sites. The MCWC has built excess capacity and larger mains into the system to accommodate the needs of the developers. Therefore, all three criteria necessary for the doctrine of laches to be applied have been met. Thus, the complaint requesting a preliminary injunction pending preparation of an EIS for the MCWC is dismissed.

### SOUTH LINCOLN RURAL WATER SYSTEM

The Sierra Club also seeks a preliminary injunction to prevent construction of the South Lincoln Rural Water System, (SLRWS), until an EIS is prepared. The SLRWS is in the developmental stage. Preliminary engineering plans have been completed, but construction has not yet begun.

The SLRWS is a rural water system designed to serve the rural residents of Lincoln and Union Counties. Approximately 940 individual rural users have subscribed to the system which would serve the 3,290 rural residents of the service area. In addition, six municipalities, located in the proposed service area, with a combined population of 5,587 persons, have expressed an interest in purchasing bulk water from the system. The Farmers Home Administration is providing funding for the project.

The Sierra Club claims the SLRWS will cause two adverse environmental impacts which require the preparation of an EIS. The two impacts are: (1) the introduction of a rural water system will stimulate urban sprawl in the form of scattered site housing which will take prime agricultural land out of production and (2) the water system will aggravate an already short water supply problem. However, the Farmers Home Administration prepared an

1. For cases which held the delay was prejudicial because the project was substantially complete, *see, Friends of Yosemite v. Frizzell,* 420 F.Supp. 390 (N.D.Cal.1976); *East 63rd Street Ass'n. v. Coleman,* 414 F.Supp. 1318 (S.D.N.Y. 1976); *Iowa Public Research Group v. Callaway,* 379 F.Supp. 714 (S.D.Iowa 1974); *Smith v. Schlesinger,* 371 F.Supp. 559 (C.D.Cal.1974); *Centerview/Glenn Avalon Homeowners Ass'n v. Brinegar,* 367 F.Supp. 633 (C.D.Cal.1973).

EIA on December 9, 1977, which concluded that the environmental impacts of the SLRWS are not significant enough to require the preparation of an EIS.

In *MPIRG v. Butz, supra* at 1320, the Eighth Circuit held that "review of an agency's determination not to prepare an impact statement should be measured by its reasonableness in the circumstances. . . ." The defendants contend that the environmental impacts of the SLRWS will not be significant because the SLRWS will conform to existing uses and be consistent with local zoning regulations. Therefore, the defendants claim, it was reasonable for the Farmers Home Administration to conclude that an EIS need not be prepared.

■ The Congressional command that NEPA be complied with "to the fullest extent possible" requires that agency decisions regarding environmental impacts of proposed federal actions be made only after a full and good faith consideration of the environmental factors. *MPIRG v. Butz, supra* at 1320; *McDowell v. Schlesinger*, 404 F.Supp. 221, 253 (W.D.Mo.1975). This good faith effort requires that the agency take a "hard look" at all potential impacts and when a negative determination is arrived at, with regard to preparation of an EIS, the agency must avoid making "bald conclusions" as to the magnitude or variety of potential effects of the proposed action. *McDowell, supra* at 250. The negative determination here was arrived at after preparation of an EIA which conscientiously analyzed the various factors which the Farmers Home Administration is required to consider when assessing a proposed action.[2] The comprehensive nature and extensive analysis of the EIA indicate that the Farmers Home Administration took a "hard look" at the environmental consequences of the proposed action and its negative determination was more than a "bald conclusion."

■ However, beyond taking a hard look and avoiding bald conclusions, there must be a reasonable basis for the negative determination. The defendants contend that the SLRWS will not significantly affect the quality of the human environment. In determining whether a major federal action will significantly affect the environment, the agency must consider:

(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area.

*First National Bank of Chicago v. Richardson*, 484 F.2d 1369, 1373 (7th Cir.1973); *Hanly v. Kleindienst*, 471 F.2d 823, 830 (2d Cir.1972); *McDowell v. Schlesinger, supra* at 250. This two part test was designed to avoid semantical battles over the meaning of the term "significantly" by substituting more precise factors. *Hanly, supra* at 831; *First National Bank v. Richardson, supra*.

*Hanly* involved the construction of an office building and prison facility in the City of New York. The prison was to be built in an area zoned as commercial and designed for a wide range of uses including prisons. The *Hanly* court concluded that "(w)here conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change." *Id.* at 831. Furthermore, since the office building would not differ substantially from the makeup of the surrounding area, it would not give rise to sizable adverse environmental impacts.

The *Hanly* rationale applies with greater force to the present action. For, unlike the office complex and prison facility in *Hanly*, SLRWS is not a completely new addition to the area. SLRWS not only conforms to existing uses, it is merely a more sophisticated and efficient replacement for the existing inadequate water supply systems which consists primarily of individual wells and cisterns. Therefore, SLRWS will cre-

---

**2.** Guidelines to be followed by the Farmers Home Administration when preparing an EIA are contained in 7 C.F.R. section 1901.304 (1977).

ate no environmental effects in excess of those created by the existing water system.

However, SLRWS has the capacity to supply water beyond the present needs of the service area. Thus the primary concerns of the Sierra Club are the possible impacts the SLRWS will cause because of its growth inducing potential. The Sierra Club contends that SLRWS will stimulate the construction of rural residences at scattered sites, resulting in urban sprawl and consuming prime agricultural land.

However, the EIA concludes these fears are unjustified for several reasons. First, the SLRWS was purposely limited in capacity to serve only the present population and the reasonably foreseeable growth needs of the service area. The present users are, almost exclusively, farm residences. The service area of SLRWS has historically experienced a slow growth rate. Growth is expected in Lincoln County, but it is caused by the expansion of the City of Sioux Falls. The growth will be concentrated in the northern tier of townships of Lincoln County.[3] The northern townships of Lincoln County are not served by SLRWS. Therefore, SLRWS will not be the stimulant for uncontrolled growth in Lincoln County.

■■■■ The EIA concluded that any growth that may be induced by the availability of a reliable water supply would be controlled by a local zoning regulation.[4] The interplay between local zoning regulations and the determination of whether a proposed federal action could significantly affect the environment was recognized in *Maryland-National Park & Planning Commission v. U. S. Postal Service,* 159 U.S. App.D.C. 158, 165, 487 F.2d 1029 (1975), when the court stated,

> When local zoning regulations and procedures are followed in site location decisions by the Federal Government, there is an assurance that such 'environmental' effects as flow from the special uses of land—the safety of the structures, cohe-

siveness of neighborhoods, population density, crime control, and esthetics—will be no greater than demanded by the residents acting through their elected representatives. There is room for the contention, and there may even be a presumption, that such incremental impact on the environment as is attributable to the particular land use proposed by the Federal agency is not 'significant,' that the basic environmental impact of the project derives from the land use pattern, approved by local authorities, that prevails generally for the same kind of land use by private persons. *Id.* at 161, 487 F.2d at 1036.

Thus the Federal agency is to be held to no stricter requirement of assuring environmental quality than local residents acting through their representatives demand. In the present action, any development that results from the availability of water from SLRWS must comply with local zoning regulations. Therefore, the growth producing potential of SLRWS will not significantly affect the environment.

The EIA concluded that any residential development that would result from the SLRWS would not consume a significant amount of prime agricultural land. The EIA identified three areas where development would most likely occur. The first is in and around six small municipalities which have expressed interest in purchasing water from SLRWS. These six communities have a combined population of 5,676 persons. Historically, these communities have experienced a slow but gradual increase in population. The EIA does not anticipate that the SLRWS will stimulate a dramatic increase in present population trends. Nor would the SLRWS be physically capable to support a significant population increase since it does not have an unlimited capacity. Any consumption of agricultural land would have to be balanced against the needs of the expanding communities. But since no dramatic increase is

---

3. Ex. AF, *Comprehensive Plan 1990, Lincoln County South Dakota* p. 37.

4. Subdivision regulations and a zoning ordinance were adopted by Lincoln County on June 28, 1971, *see,* Ex. AK and AL.

expected, any agricultural land taken out of production would not be significant since 95% of the land in Lincoln County is devoted to agricultural uses.

The second area of potential growth is the northernmost tier of Lincoln County which is adjacent to the City of Sioux Falls and would be influenced by the growth of that city. However, this area is not served by SLRWS, and any growth that would result here would not be caused by the SLRWS.

The third area of growth parallels the Big Sioux River in Lincoln County. This is a very hilly area and not prime agricultural land. Therefore, the development of residential housing which SLRWS may stimulate will not be dramatic, and any development that would occur would not consume a significant degree of prime agricultural land.

The Sierra Club next contends that the SLRWS will adversely affect the quantity of water which is already in short supply. Again, the EIA concluded that there were sufficient water resources to supply the needs of the SLRWS since it had a limited supply capacity. In *Environmental Defense Fund, Inc. v. Hoffman,* 566 F.2d 1060 (8th Cir.1977), the court held that an EIS was not defective for failure to discuss the possibility of an increase in the consumption of water due to an increase in irrigation. The only major crop raised in the area which required a great amount of water was rice. However, federal programs strictly regulated the amount of rice in production. Therefore, the court reasoned, significant increases in the amount of irrigation were remote and failure to address this issue in the EIS did not make the EIS defective. Similarly, the capacity of SLRWS is limited. Any increases in consumption will not be significant. Further, the Water Rights Commission of the South Dakota Department of Natural Resources has preliminarily concluded that approval of a water permit for SLRWS will not involve the use of that which is in short supply.

## Conclusion

Only major federal actions which significantly affect the quality of the human environment, within the meaning of section 102(2)(A) of NEPA, require the preparation of an EIS. The SLRWS will conform to existing uses and therefore will not significantly affect the environment. Its growth producing potential is negligible since its capacity to supply water is limited to existing demands and the reasonably foreseeable growth of the area. The area to be served by the SLRWS is a highly developed agricultural area with a few small towns. No significant change is expected in population or land use patterns. Any scattered site housing or urban sprawl that may result is essentially a problem of local governments to solve through the exercise of their zoning authority. Lincoln County has adopted a comprehensive zoning and subdivision plan to control growth. Any growth must conform to these zoning requirements and therefore it would not significantly affect the environment. Construction of the SLRWS would not involve water in short supply. Since the SLRWS will not significantly affect the quality of the human environment, it was reasonable for the Farmers Home Administration to determine that an EIS is not required. The complaint seeking an injunction against further construction of the SLRWS is, therefore, denied.

The foregoing memorandum decision constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52 F.R.C.P.