**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO et al., Plaintiffs,**

v.

**Richard KLEINDIENST, Attorney General of the United States, U. S. General Services Administration, et al., Defendants.**

No. 72 C 3132.

United States District Court, N. D. Illinois, E. D.

May 25, 1973.

Calvin P. Sawyier, Winston & Strawn, Lois F. Lasky, Chicago, Ill., for plaintiffs.

James R. Thompson, U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

McGARR, District Judge.

### I

Plaintiffs in this case, seeking to assert the public interest, have been determined by the United States Court of Appeals for the Seventh Circuit to have standing to maintain this action. The First National Bank of Chicago, et al. v. Richard Kleindienst, Attorney General of the United States, et al., No. 73–1324. They seek to enjoin further construction activity on a building in the near vicinity of the Everett McKinley Dirksen Building at 219 South Dearborn Street. The project sought to be enjoined is the third in a series of federal buildings and is known as the U.S. Courthouse Annex and Federal Parking Facility. It may be assumed, as the evidence suggests, that the construction of the Annex is dictated by and will further the efficiency and efficacy of governmental operations and will particularly be of benefit to those members of society charged with or convicted of a crime. If the project is not environmentally sanctioned, however, these other considerations become irrelevant.

In a complaint filed on December 11, 1972, plaintiffs alleged failure of the General Services Administration, the agency responsible for the construction of this project, to comply with the substantive and procedural requirements of the National Environmental Policy Act of 1969 (hereinafter referred to as NEPA), 42 U.S.C.A. Section 4331–4347, Executive Order 11514 and subsequent Guidelines published in conjunction therewith.

In an order dated March 30, 1973, the District Court denied plaintiffs' motion for a preliminary injunction against further construction of the U.S. Courthouse Annex and Federal Parking Facility. An expedited appeal from this order resulted in a decision by the United States Court of Appeals for the Seventh Circuit dated April 26, 1973, which established, inter alia, the following propositions:

1. That the plaintiffs had standing to sue and bring about a review of administrative action in this case;

2. That such delay as was demonstrated in the bringing of this action did not constitute laches and was not a bar to the continuing prosecution of this action;

3. That defendants have an obligation to make a detailed environmental impact statement pursuant to 42 U.S.C.A. Section 4332(2)(C), unless an adequate determination has been made that the project does not significantly affect the quality of the human environment; (The statement so contending has been denominated by the parties in this proceeding a "negative impact statement".)

4. That it is at least highly probable that the defendants' determination that the project will not significantly affect the quality of the human environment will be found inadequate under the standard of review in Hanly v. Kleindienst, 471 F.2d 823 (2d Cir., 1972).

The cause was remanded, with instructions, to the District Court. Pursuant to those instructions an order was entered on May 7, 1973, enjoining further construction of the U.S. Courthouse Annex and Federal Parking Facility, such injunctive order to become effective at 5 p. m. on May 26, 1973. In the interim since the issuance of that order, the defendants have invited and received objections to the construction of the U. S. Courthouse Annex and Federal Parking Facility based upon its effect upon the environment, and after consideration of these and other factors, the government filed on May 15, 1973, a document

entitled Supplemental Environmental Assessment for U.S. Courthouse Annex and Federal Parking Facility, Chicago, Illinois. This supplemental assessment was supported by a large number of exhibits. The assessment and the exhibits have been admitted into evidence as Government's Exhibits 1A, 1B, and 1C, and are part of the record in this case.

On May 17, 1973, the General Services Administration considered the supplemental data and made the following determination:

"Pursuant to the provisions of GSA Order PBS–1095.1b, as revised, this is to advise you of our determination based on review of the Supplemental Environmental Assessment dated May 15, 1973, that construction and operation of the U.S. Courthouse Annex and Federal Parking Facility is not considered to be a major federal action that would significantly affect the quality of the human environment."

It is this administrative determination that this Court is called upon to review.

Plaintiffs contend first that a so-called negative impact statement is insufficient in the instant case, in that the project significantly affects the human environment and therefore requires a detailed environmental impact statement rather than the negative statement submitted. Plaintiffs further contend that because the project in issue does significantly and adversely affect the human environment, the determination of the administrative agency is capricious, arbitrary, an abuse of discretion, or otherwise not in accordance with the law or procedures required by law (Hanly v. Kleindienst, 471 F.2d 823 [2d Cir., 1972]).

Considerable evidence has been submitted to the Court in the form of the Supplemental Environmental Assessment and testimony adduced by the plaintiffs concerning the aesthetic, psychological, environmental, and social impact of the U.S. Courthouse Annex and Federal Parking Facility. A consideration of

that evidence should be preceded by a reiteration of the precise issue to be determined by this Court, and to which such evidence may be deemed relevent. At the risk of repetition, the administrative determination under review here was that the construction of this project was not considered to be a major federal action that would significantly affect the quality of the human environment. There flows from this conclusion the necessary determination that if the administrative decision was correct, no detailed environmental impact statement is required. The Supplemental Environmental Assessment submitted by the government, therefore, is not in lieu of, nor can it be considered as, a detailed environmental impact statement. It is, rather, a statement in support of the contention that the project is not a major federal action that would significantly affect the quality of the human environment, and the evidence submitted by the plaintiffs must be considered in the context of whether it depicts a project which is a major federal action that does significantly affect the quality of the human environment. It is the function of this Court, in reviewing all of the evidence in this context, to determine whether the above-described administrative decision is capricious and arbitrary and an abuse of discretion.

II

The controlling statute in this case is Title 42 Section 4332, and the particular portion of that statute which has application here is as follows:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in deci-

sionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

The law applicable to this case is in great part contained in two decisions, a discussion of which is appropriate.

In early 1972, excavation began in New York City on a project envisioning a nine-story federal jail in back of the United States Courthouse in Manhattan and just across the street from two large apartment buildings. The Reverend Denis Hanly, pastor of Transfiguration Church in the vicinity of this project, and other plaintiffs, sought to enjoin this construction for the reason that they believed the defendants had ignored the requirements of the National Environmental Policy Act. Judge Tenney in that case held that the General Services Administration had considered "all of the environmental factors relevant to the construction of the annex" and that GSA's conclusion that the annex "will not have a significant adverse impact on the environment" was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Two consecutive appeals resulted from this District Court lawsuit. The first, Hanly v. Mitchell, is reported at 460 F.2d 640, and the second, Hanly v. Kleindienst, is reported at 471 F.2d 823. Because these Second Circuit decisions deal with the application of the National Environmental Policy Act of 1969, 42 U.S.C.A. 4331 et seq. to a construction project somewhat analogous to the one under consideration here, the *Hanly* decisions are highly relevant to the determination of this case.

Hanly v. Mitchell (hereinafter, *Hanly I*) holds that in the application of the National Environmental Policy Act of 1969 to the construction of the jail contemplated therein, NEPA should be broadly construed to extend beyond the

traditional concepts of water and air pollution and must be deemed to include protection of the quality of life for city residents. The Court held, therefore, that it was appropriate to consider a broad spectrum of factors such as traffic, mass transportation systems, crime, congestion, and the safety of citizens in the vicinity of the federal project. *Hanly I* further held that the determination of the National Environmental Policy Act impact upon the project requires a threshold agency determination as to whether the project is a "major Federal actions significantly affecting the quality of the human environment". If this threshold determination is in the affirmative, it then becomes incumbent upon the responsible federal agency to make a detailed environmental impact statement. If the threshold determination is that the project contemplated is not a major federal action significantly affecting the quality of the human environment, then such a detailed impact statement is unnecessary.

The Second Circuit additionally held that the General Services Administration was the appropriate agency to make the above determinations in the instance of a proposed jail building, that GSA was required to take into account all of the relevant factors and, in the event of the issuance of what has now come to be called a negative impact statement, was required to recite the basis for its determination in sufficient detail to provide a reviewable record. The standard of review to be applied by the Court was discussed in *Hanly I* but not decided for the reason that the Court deemed the negative impact statement before it inadequate by either of the standards of review contended for by the parties. *Hanly I* also addressed itself to the question of whether the applicable section of 42 U.S.C. 4332(2) was only Subsection (C) thereof, the section focused on by the Court in its opinion, or whether, as plaintiffs contended, the government was compelled to comply also in its determination of insignificant impact on the environment with Subsections (A),

(B), and (D) of Section 102–2. This issue had not been focused upon in the Court below and was remanded for further consideration.

On remand, the District Court denied a preliminary injunction for the second time, and for the second time plaintiffs appealed. In Hanly v. Kleindienst (hereinafter, *Hanly II*), 471 F.2d 823, certain issues left open in the earlier opinion were decided. As referred to earlier, *Hanly II* reasserted that the General Services Administration was the appropriate body to make the threshold determination whether the project was one "significantly affecting the quality of the human environment" so as to require a detailed environmental impact statement as set forth in Section (C) of the Act. *Hanly II* also made clear that the function of the Court reviewing this agency determination was to apply to this determination the test of whether the agency findings were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or without observance of procedure required by law.

In *Hanly II*, a twenty-five page negative impact statement was reviewed by the Court and the case remanded for further proceedings on two issues which the Court felt were not adequately developed in the hearing below. The first was the question of whether the proposed facility would increase the risk of crime in the community, and create other problems arising out of the close proximity of the proposed building to nearby residential high-rise buildings. Further, *Hanly II* concerned itself with the need for compliance with Section 102(2)(B), which requires the agency to identify and develop methods and procedures " . . . which will insure that presently unquantified environment amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." The Court goes on to say that where the sensibilities of a neighborhood are involved, the prudent course would be for an agency in charge, before

making a threshold decision, to give notice to the community of the contemplated action and to accept all pertinent information proffered by concerned citizens with respect to it. The Court suggests a public hearing for this purpose in this case, but hastens to add that neither NEPA nor any other federal statute mandates a specific type of procedure to be followed by federal agencies to achieve the objectives stated in Section (B). As the Court says, "There is no statutory requirement that a public hearing be held before a site for a house of detention is selected by the Attorney General or construction of the facility is undertaken by the GSA . . . Although the Guidelines issued by the CEQ suggest that agencies 'shall include, whenever appropriate, provision for public hearings, and shall provide the public with relevant information, including information on alternative courses of action,' Council on Environmental Quality, Statements on Proposed Federal Actions Affecting the Environment, Guidelines § 10(e), 36 Fed.Reg. 7724, 7726 (April 23, 1971), these provisions apply only to the procedure for preparation of detailed impact statements *after* the preliminary determination of significance has been made." (471 F.2d pp. 835–836) The Court remands for implementation of its suggestion that some sort of provision for ascertainment of public reaction is appropriate in that case.

After the second remand as a result of the decision in *Hanly II*, it must be assumed that the areas of concern to the Court were satisfactorily resolved at the District Court level. A full appreciation of the meaning of the *Hanly* decisions must encompass the fact that the detention facility in issue was completed and is in use, on the basis of an administratively approved negative impact statement, which was ultimately accepted by the Court.

### III

It is the conclusion of the Court for purposes of the case in issue here that the hearing requirement which was a

suggestion and not a mandate in *Hanly II*, is not required by the circumstance of this case for the reason, among others, that the circumstances here differ from those in *Hanly*. There is no suggestion in this case that the detention facility will be built in close proximity to existing residential areas. Nor is there any evidence in the record which compels the conclusion that the site will ever be in close proximity to residential areas. The existing telephone company, Western Union, government and office and bank buildings almost completely surround the site to the east, south, and west. The planned New Town-In Town to the south can never be contiguous.

Additionally, nothing in the record supports an estimate, much less a determination, as to when, if ever, this New Town-In Town project will commence, and after commencement, where within it residential areas will be located or how close to the U.S. Courthouse Annex they will be.

Therefore, it must be concluded that the factor of impingement on residential areas which was a source of concern in *Hanly I and II* is not present here.

■ Rather, the detention facility here is being built in an area which is almost evenly divided between commercial buildings which will remain despite the plans for rehabilitation of the area, and substandard retail and transient hotel buildings which can only benefit by the completion of the structure contemplated here. *As Hanly II* suggests, "the necessity for a hearing will depend greatly upon the circumstances surrounding the particular proposed action and upon the likelihood that a hearing will be more effective than other methods in developing relevant information and an understanding of the proposed action. The precise procedural steps to be adopted are better left to the agency, which should be in a better position than the court to determine whether solution of the problems faced with respect to a specific major federal action can better be achieved through a hear-

ing or by informal acceptance of relevant data." (471 F.2d p. 836) The General Services Administration in this case having exercised its discretion in favor of the latter procedure, that is the informal acceptance of relevant data, and that action not being under the circumstances manifestly capricious or arbitrary, it is the conclusion of this Court that the absence of a public hearing in the instant case does not constitute a procedural defect in the administrative determination.

## IV

There are two other respects in which the situation faced by the Second Circuit in the *Hanly* cases differs from the situation here. In the application of the conclusions reached by that Court, they should be borne in mind.

There is first, no strong element in this case of the "sensibilities of a neighborhood" (*Hanly II*, 471 F.2d p. 835) which was an acute problem in *Hanly* and of concern to the Court.

Further, the evidence in this case makes it clear that the objectors do not complain as much of the project in question as their lack of an opportunity of further consideration which would be afforded by a detailed environmental impact statement. Therefore, the proposed building cannot be considered "highly controversial", a phrase applied by the Court to the New York project.

Even if the project were to be deemed highly controversial, we must turn to *Hanly* for the rejection of any unusual legal consequences arising out of that situation.

The Court discusses (*Hanly II*, 471 F. 2d p. 830) the proposition found in Council on Environmental Quality, Statements on Proposed Federal Actions Affecting the Environment, Guidelines Section 5(b), 36 Fed.Reg. 7724 (April 23, 1971), that formal detailed environmental impact statements should be required regardless with respect to "proposed actions the environmental impact of which is likely to be highly controver-

sial". The Court rejected the proposition in language applicable here (at page 830):

However, the term "controversial" apparently refers to cases where a substantial dispute exists as to the size, nature or effect of the major federal action rather than to the existence of opposition to a use, the effect of which is relatively undisputed. This Court in *Hanly I*, for instance, did not require a formal impact statement with respect to the office building portion of the Annex despite the existence of neighborhood opposition to it. The suggestion that "controversial" must be equated with neighborhood opposition has also been rejected by others. See Citizens for Reid State Park v. Laird, 336 F.Supp. 783 (D.Me., 1972).

■ Additionally, the CEQ guidelines are advisory, not mandatory. Greene County v. F.P.C., 455 F.2d 412 (2d Cir., 1972).

## V

A. The evidence in the case reveals that the below grade construction on this building is substantially complete and that six or more millions of dollars have already been expended. There is implicit in this fact the suggestion that enjoining the project now would entail a major financial loss to the government.

■ This fact is not relevant to the determination of the issues before the Court. If the project has proceeded in violation of the law, its partial completion cannot justify it. Plaintiffs have suggested that the government could minimize the financial impact of an adverse ruling by building a structure on existing foundations dedicated to more acceptable uses. Except for the concession implicit in this view that the same building without detention and parking would not be objectionable, this aspect of the evidence and the controversy is irrelevant to the issue before the Court.

Every building, government or private, has an effect on the environment.

This is particularly true of large buildings for commercial or institutional purposes. Yet the erection, completion, and occupancy of such buildings in the central city is traditionally considered a contribution to the quality of life worthy of commendation and expressions of appreciation from public officals representing the community. The citizens of Chicago are frequently treated to stories of the cornerstone laying or topping out of significant commercial structures whose undoubted negative impact upon the environment is universally accepted as too negligible to warrant comment in the shadow of the undoubted benefits the building affords to the community in which it is erected. In other words, it is not generally believed that the erection of a commercial building has a significant adverse environmental effect. As this is true of the recently completed Sears Tower, Standard Oil Building, the Everett McKinley Dirksen Building which the Court now occupies, and many others about the city, so also it may be presumed true of the contemplated addition to the federal building complex in downtown Chicago. The contention, however, that the Courthouse Annex has a unique environmental impact, unlike other buildings being erected within close proximity to it of significantly larger size and with significantly larger contemplated populations, arises from the fact that this building is destined to function in part as a federal detention center and in part as a parking facility.

The evidence reveals that the Congress of the United States approved the U.S. Courthouse Annex and Federal Parking Facility, such action being taken by the Senate on October 23, 1969, and by the House of Representatives on March 24, 1970, the first action shortly before and the second shortly after the enactment of the statute referred to as NEPA, which is controlling here, and both actions at a time when Congress was acutely aware of and sensitive to environmental considerations. The prospectus then before that legislative body specifically provided for the construction of this facility on the site which it now occupies. The evidence further reveals a structure aesthetically pleasing and built with consideration for the preservation to the public of large open and landscaped areas (Defendant Exhibit 11) immediately adjacent to it, a condition not prevailing anywhere else in the immediate vicinity of the site. The design earned an honor award for excellence from the Smithsonian Institute on the recommendation of the National Public Advisory Panel on Architectural Services, and the Supplemental Environmental Assessment reveals a careful consideration of all of the factors normally attendant upon the construction of such a building and its impact upon the facilities of the community. In making its determination of negative environmental impact, the General Services Administration had before it and considered information on the construction of the building, its conformity to the building codes, the adequacy of existing utilities proposed to be used, the availability and adequate supply of water, waste disposal facilities, gas, electricity, and telephone service. Studies were made of the impact of the building on traffic, both on the side street which serves its entrance and which will be substantially widened and the major thoroughfares to which it is adjacent.

From the record, it is clear that considered as a structure, the proposed U.S. Courthouse Annex and Federal Parking Facility has no more environmental impact on the quality of life in the Chicago urban community than any other of the well constructed, well designed buildings which are being erected in the city on a variety of sites. The extensive evidence in the record satisfies the Court that there has been no abuse of discretion in the GSA determination of no significant environmental impact by virtue of the design, construction, or location of this structure.

B. The essential contention of the plaintiffs, however, is that two principal proposed uses of the building, one as a place for detention of prisoners and the

servicing of probationers, and the other as a parking facility for 850 cars, have a significant environmental impact, the extent of which renders the negative impact determination of the General Services Administration capricious and arbitrary, and requires a cessation of further development of the site until a detailed environmental impact statement can be furnished and considered. An examination of the testimony adduced by plaintiffs in support of this contention reveals some characteristics that run through all the evidence.

The first of these is the reluctance of most of plaintiffs' witnesses to state that the proposed facility would have a deleterious environmental impact. Several of the witnesses were experts with impressive credentials. But none displayed knowledge of the project sufficiently thorough and detailed to serve as the foundation for an expert opinion. Nor did they, for the most part, render such an opinion. Witness Abboud said that the impact of a jail in the area does not have to be detrimental, but could be. He did not know whether the impact of this structure would be detrimental. He had not seen the drawings or ground use plans for the building. His principal and obvious concern was the possible detrimental effect on the proposed development of the six hundred acre railroad property as part of New Town-In Town. He conceded that this latter plan was conceptual, that the land was not acquired, the plan for its development not detailed, that it awaited the razing of the Elevated tracks, and that the plan "looked to 1985". The witness Abboud was obviously expert and refreshingly candid. His testimony, however, cannot be deemed to support the contention that the administrative agency determination in issue here is capricious and arbitrary.

Another expert with impressive credentials, Architectural Planner Roger Seitz, was equally candid. He conceded that jails need not have a bad connotation, that the projected structure did not look like a jail, that he felt it to be se-

cure, and he did not expect it to cause an increase in crime.

It seems a fair characterization of the attitude of both these gentlemen that they did not find the project clearly environmentally detrimental, but had doubts sufficient to cause them to want further opportunity for study. Such evidence cannot sustain plaintiffs' burden of demonstrating that the agency determination of no significant environmental impact is capricious.

A second characteristic which runs through plaintiffs' testimony is the contention that the impact upon the quality of life of a structure designated as a jail is none the less real because psychological. The apparent public image of any structure denominated "jail" is a stone fortress with iron bars housing vicious human beings. The design of the building in question, with its pleasing aesthetic exterior, with the prisoners screened from public view as part of the design, taking such exercise as they take on the roof of the structure away from public view, and entering and leaving the structure in vehicles via subterranean entrances also away from public view, confirms and provides a basis for the General Services Administration determination that whatever psychological unpleasantness is visited upon the public's sensitivities by a jail structure will not be present in the instance of this structure, and that this type of affront to public sensitivities is not a factor which will function as a detriment to nor make a contribution to a diminishing of the quality of urban life.

Another area of objection to the proposed building is the concern for public safety expressed by some witnesses, though not by all. It is hardly necessary to observe that the criminals housed in the detention center are securely inside. Evidence of the security precautions connected with the use of part of the building as a prison, indicates more than adequate regard for public safety. Plaintiffs emphasize, however, that an area of greater concern

lies in the visitation of this facility by probationers and parolees and other persons subject to accusation of crime and involved in the presentence investigation or counseling processes. The evidence amply demonstrates, and the General Services Administration did not err in concluding, that this situation is not a significant environmental concern. Indeed plaintiffs' witnesses, who were unstinting in their praise of the Everett McKinley Dirksen Building, were totally unaware that the same processes which they fear in the new building have been going on in the Dirksen Building since it has been open, and for many years in the old Courthouse which once stood across the street.

■ It is the finding of this Court that the evidence supports the determination of the General Services Administration that the treatment of offenders and detention usages of this facility do not compel a finding of significant adverse environmental effect. The record supports the conclusion of this Court that the determination by the General Services Administration that this detention facility has no significant environmental impact, is not capricious, arbitrary, an abuse of discretion, or otherwise not in accordance with law or without observance of procedure required by law.

The second unique usage of the proposed facility which distinguishes it from the ordinary unobjectionable commercial structure is the provision for the off-street parking of 850 vehicles. It is characteristic of the fluid concepts of the evolving approaches to urban planning that, but a short while ago, this dedication of a large portion of the structure to off-street parking would have been its most praiseworthy feature. This was undoubtedly true at the time of the original proposal, plans, and drawings for this building. Plaintiffs' witnesses have testified in this case, however, that it is no longer deemed desirable in terms of urban planning to provide off-street parking in the Loop area for the reason that this available parking encourages

vehicular traffic to enter the Loop which might not otherwise do so. The current theory apparently is that a planned scarcity of parking space in the Loop will encourage the use of public transporation and thus decrease auto traffic congestion.

■ The evidence considered by the General Services Administration, however, has as its principal thrust the fact that the additional parking made available in this building will not significantly increase the volume of traffic in and out of the Loop areas nor contribute significantly to congestion in the streets immediately surrounding the building. The General Services Administration reached this conclusion based upon this evidence. Having considered the same evidence, and additionally the testimony of plaintiffs' traffic expert, Professor John Bailey, this Court cannot conclude that this administrative determination was an abuse of discretion or was in any way unreasonable or arbitrary.

## VI

We turn next to the consideration of viable alternatives to the existing project. Title 42, Section 4332(2)(D) requires that the government study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. *Hanly II* assumes from this language, although it is certainly not clearly contained therein, that a consideration of alternatives is a necessary condition to a threshold determination of the question of significant impact upon the environment.

■ Accepting the decision of the Court in *Hanly II* to the effect that Section 102(2)(D) requires a specific consideration of alternatives, we find that the assessment of alternative sites presented by the evidence and encompassed in the decision of the administrative agency herein being reviewed, was sufficient to satisfy the requirements of that section. The record reveals a suffi-

cient consideration of alternative sites and the possibility of constructing the desired facility elsewhere, or not constructing it at all. The administrative agency gave adequate regard to appropriate and relevant factors and its ultimate conclusion cannot be deemed to be capricious or arbitrary.

## VII

■ It is clear that the spirit of NEPA envisions public input into the environmental decisions of a governmental agency. As has earlier been discussed, this fact does not mandate public hearings, but it does require some evidence of efforts to ascertain community concerns and a good faith response to them.

The record contains evidence of general public knowledge of the proposed U.S. Courthouse Annex and Federal Parking Facility commencing in a very limited way in 1958 in the long-range plans of the Committee for Government Buildings Downtown, and coming to general public attention commencing in January of 1971 with fairly consistent newspaper reports and comment on the project throughout 1971 and 1972. The evidence also reveals formal and informal contact and interaction with agencies and individuals concerned with environmental considerations, both federal and local. Defendants' exhibits in this connection support, and the evidence of plaintiffs does not contravene, the determination that the community liaison dictates of NEPA were reasonably and adequately complied with.

On May 3, 1973, shortly after the remand to this Court, the attorneys for the plaintiffs were asked by the General Services Administration for information reflecting their views as to whether this project had a significant effect upon the environment. Responses concluding that it did were filed and incorporated in the defendants' evidence (Exhibit 21). They included objections from Harvey S. Perloff, Dean of the School of Architecture and Urban Planning, University of California, Los Angeles, Herbert Gans,

Professor of Sociology, Columbia University in the City of New York, and Real Estate Research Corporation, a consulting firm in Chicago, in a letter signed by James C. Downes, Jr., Chairman of the Board. The most impressive of these was the Real Estate Research Corporation letter, both because of its comprehensiveness and because the author is much more intimately involved in the affairs and development of the City of Chicago than the more remote experts in the other communications.

The Real Estate Research Corporation objections rely heavily upon the gateway concept, that is the proposition that New Town-In Town or any other redevelopment of the near south area requires gateways or corridors from the Loop to the new area along existing streets, and that the U.S. Courthouse Annex is a dead frontage along a gateway street, South Clark Street. It is difficult to consider the proposed structure, with its open plaza and landscaping as a dead frontage. Further, it encompasses only one side of the gateway street and its "Chinese Wall" effect must be deemed insignificant in comparison with the monolithic telephone and governmental structures just south of it.

Traffic considerations referred to by Mr. Downes have been dealt with elsewhere. The concern with a solid block of parking facility frontage ignores the fact that this type of structure is indigenous to the area and that other similar facilities now existing were not deemed deleterious to the New Town-In Town concept, principally I presume because of their lack of proximity to the northern boundary of that development. His concern with the psychological factor, the sense of foreboding inspired by a jail, has been previously discussed.

In sum, opportunity for objection was made available. Objections, including those referred to and others, were filed. The so-called negative impact statement refers to these and indicates their consideration by the administrative agency. The evidence before me does not compel the conclusion that the disagreement of

the administrative determination with these objections was capricious and arbitrary or in violation of law.

## VIII

Plaintiff has contended throughout that the environmental tests applicable to a governmental project are broader than the government concedes, and that each project must be tested for environmental impact in the light of Title 42, Section 4332, Paragraphs (2), (A), (B), (C), and (D).

A fair reading of the statute supports the conclusion that all of the subparagraphs of this section, that is subparagraphs (A) through (H) are with one exception general rather than particular in their application. This means that they mandate broad environmental concerns interdisciplinary integration and cooperation, the formulation of methods and precedures in cooperation with the Council on Environmental Quality, development of alternative uses of resources in conjunction with environmental concerns, adaptation of a global outlook, cooperation with and exchanges of information with local agencies, and concern for ecology in the use of resources. All of this is to be carried out by direction of Congress as the result of a mandate curiously weakened by the inclusion of the qualifying phrase "to the fullest extent possible".

There is no doubt that subparagraph (C) has particular application to individual major projects. Plaintiffs contend that this is also true of (A), (B), and (D). They make no similar contention for (E) through (H). *Hanly I* declines to decide the issue and refers it back to the District Court. *Hanly II* does not enlighten us as to why the admittedly "opaque" and "woefully ambiguous" (471 F.2d p. 825) sections (A), (B) and (D) must be applied to individual projects, but assumes that they must and applies them. Without agreeing that the statute intended this or requires it, it is nonetheless possible to do the same here.

It is the conclusion of the Court that the evidence concerning the interaction of federal and state agencies in the early and planning stages of this project satisfies the requirement of Subparagraph (A) that a systematic interdisciplinary approach be utilized. With regard to Subparagraph (B), the Court deems it inapplicable to the present situation, in keeping with the holding in *Hanly II* (471 F.2d pp. 835–836) that the regulations of the Council on Environmental Quality are tailored to the presentation of a detailed environmental impact statement not required here, and concludes further that the regulations of the Council on Environmental Quality are hortatory but do not have the force of law and are otherwise inapplicable to this situation. Subparagraph (C) requires a detailed environmental impact statement on major federal actions significantly affecting the quality of the human environment. It has been the thrust of this opinion, and is the determination of this Court, that the project herein involved is not a major federal action significantly affecting the quality of the human environment and compliance with Section (C) is not required. To the extent that Section (D) is deemed applicable to this specific project, the Court finds that it has been complied with and that the administrative determination was made with cognizance of the available alternatives and a determination that they were not feasible, a determination which was not capricious and arbitrary in the light of the existing evidence.

## IX

By way of summary, and before reaching a conclusion as to the propriety of the administrative determination under review, an overview of the problem seems desirable to restore the perspective lost in the preceding lengthy consideration of so many details.

Whether there is a significant and adverse environmental impact resulting from the construction of the U.S. Courthouse Annex and Federal Parking Fa-

cility must be considered in the context of the place of the project in the overall plan for urban renewal and development of the area immediately south of Chicago's Loop, which was the subject of almost constant reference by plaintiffs and all of plaintiffs' witnesses. The evidence reveals that development of this section of the city has been suggested to city planners by the recent availability for other purposes of some six hundred acres of land in the area immediately south of the Loop once utilized as a railroad yard. With the development of this land as the nucleus, broader plans have been formulated for the renovation of the entire area south of the Loop, commencing at a point somewhat south of the site of the building involved in the instant controversy and extending southward to approximately Roosevelt Road. The oft-referred-to plan is commendable but somewhat amorphous. It has not yet been published, nor was any copy of it available at the trial. According to the testimony of plaintiffs' witnesses, it involves the development of a "New Town-In Town" concept embracing residential, commerical and industrial buildings made more desirable by their close proximity to the downtown area. The planners and the plans seem not to have been deterred by the fact that it will be contiguous with the Chicago Police Department Central Headquarters which also embraces a detention facility and supports the usual traffic of persons charged with crime going to and from the courts and administrative offices housed in that building.

In contrast to the amorphous plan with which plaintiffs contend the proposed structure is not in harmony, are the present existing conditions surrounding the site. The Courthouse Annex site is bounded on the south by an eight-lane divided expressway, the Eisenhower Expressway. The south side of that expressway, directly opposite the federal project, is occupied by two Illinois Bell Telephone Company buildings, both monolithic and virtually windowless

structures which are in the early years of their projected useful lives and which will stand as a wall between the Annex and the northernmost reaches of New Town-In Town. To the immediate east of the Annex is a new structure housing part of the facilities of a downtown bank and a ground-level parking lot. Further to the east are two very old commercial structures which, because of their association with the history of Chicago and their architectural excellence, are destined to be preserved as landmarks. To the west of the Courthouse Annex site is a block-long row of substandard commercial buildings, with restaurants, magazine shops, taverns, and transient hotels. It is apparent from the evidence that the federal project is in the center of and will enhance a relatively fixed commercial area with many buildings which will not be destroyed or otherwise affected by New Town-In Town. As the Court says in *Hanly II*, "absent some showing that an entire neighborhood is in the process of redevelopment, its existing environment, though frequently below an ideal standard, represents a norm that cannot be ignored."

It is also apparent from the evidence that New Town-In Town will not, in its contemplated residential development, come closer than several blocks from the Courthouse Annex, even if the residential development were put at the northernmost extremity of the new project. Expert testimony of the effect of the building in creating a so-called "dark area", that is an area which does not support or stimulate pedestrian traffic and therefore creates in the evening an island devoid of pedestrian and social activity, is a conclusion applicable to most buildings in the immediate vicinity and virtually every commercial building in downtown Chicago. The U.S. Courthouse Annex will differ however, from most other commercial buildings which also produce the "dark area" effect, by the presence of a well-lighted plaza resulting from its limited use of the total

ground area available and will, therefore, provide a small park-like area in the heart of the congested inner city.

## X

In light of the foregoing, it is the conclusion and determination of this Court that the General Services determination here being reviewed, and by virtue of which the U.S. Courthouse Annex and Federal Parking Facility in Chicago has gone forward, is consistent with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C.A. Sections 4331–4347, Executive Order 11514 flowing therefrom, the Guidelines of the Council on Environmental Quality on Statements on Proposed Federal Actions Affecting the Environment, Circular No. A–95 Revised, dated February 9, 1971, and that the determination of the General Services Administration as to the lack of significant environmental impact of this project, thus taking it out of the purview of Section (C) of Title 42, Section 4332, was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or without observance of procedure required by law.

For the foregoing reasons, the motion of plaintiffs for a preliminary injunction is denied.