OPINION OF THE COURT
Joseph D. Quinn, Jr., J.
In this mandamus proceeding, brought to review a determination of the New York State Director of the Division for Youth that proposed construction, involving the conversion of a three-building section of the Harlem Valley Psychiatric Center, in the Town of Dover, Dutchess County, into a detention facility for juveniles convicted of serious crimes, would not significantly affect the quality of the environment, so that no environmental impact statement was required, petitioners seek to enjoin construction of that facility, now under way, pending filing of an environmental impact statement. At issue is whether coercive relief should *628 be granted or whether the Director of the Division for Youth has met the requirements of the State Environmental Quality Review Act (SEQRA; ECL art 8) by issuing a negative declaration intended to show that this action will not have a significant effect upon the environment.
Petitioners here are Harlem Valley United Coalition, a not-for-profit civic organization comprised of some 150 landowners and residents of the Harlem Valley area who are dedicated to studying and investigating the protested project and to promoting and protecting the environment, and 20 individual property owners and residents of the area who are in sympathy with the organization’s principles.
Papers before the court indicate that Harlem Valley Psychiatric Center, located at Wingdale, New York, began operations in 1924 as a traditional State mental hospital. It is situate on a campus of 960 acres in southeastern Dutchess County. The eastern-most portion of the site is contiguous to the Appalachian Trail, and is within five miles of the Connecticut border. The western part is largely open land and includes a nine-hole golf course. This institution was built to accommodate a patient population of several thousand. Of a total of 102 buildings of varying size, capacity and usage, there are 32 buildings in the main complex. The site has its own reservoir, coal-fired heating plant, power plant, water treatment facility and institutional laundry, food and maintenance services. It is served by bus and by both passenger and freight rail lines.
Since the early 1970’s, when New York’s mental health policy shifted to development of noninstitutional services, the Harlem Valley Psychiatric Center has experienced the greatest percentage reduction in terms of in-patient census of all the State’s psychiatric centers. This center currently serves fewer than 500 patients within the hospital complex, and more than 3,000 mentally disabled persons in various community settings. About 45% of the resident patients are over 65 years of age, while the remainder range in age from 21 to 64 years. It is said that relatively few of the current resident patients would require continued hospitalization, were alternative care facilities available. Transfer *629 of physical plant management and operation from the Office of Mental Health to the Office of General Services is apparently now in process. (Report to the Governor on the Future of Harlem Valley Psychiatric Center [April, 1980].)
As the result of a search for a site for a so-called secure detention facility for 160 juveniles, the Director of the Division for Youth settled upon buildings 4, 5 and 6 in the Harlem Valley Psychiatric Center early in 1980. On June 23, 1980, the Legislature appropriated $4,500,000 to fund acquisition of property, preparation of plans, alterations and improvements, construction, and furnishing and equipment for the project for the fiscal year beginning April 1, 1980. Another $1,000,000 was earmarked for initial operating expenses for October 1, 1980.
It seems that this decision by the Legislature to commit State resources to the project caused a wave of protest in the form of resolutions adopted by several municipal boards in Dutchess County and forwarded to the Governor or other State officials. Passed by the local legislative bodies of the Towns of Dover, Beekman, Pawling, East Fishkill, Milan, Northeast, Stanford, Wappinger and Washington, the Villages of Millbrook and Pawling, the City of Beacon and the County of Dutchess, the tone of these measures is that the patent danger to the community inherent in the project requires that an environmental impact study be made before final decision is rendered. Additionally, more than 3,000 county residents objected to the proposal in a petition sent to the Governor at the same time.
The gist of petitioners’ claim is that, in Dutchess County, where it is said without contradiction that 1.3% of the State’s general population resides and 17% of the State’s prison population is incarcerated, experience dictates that the rate of escapes from maximum security and secure detention, institutions is high and that escapees frequently commit crimes in the surrounding communities, hence jeopardizing the lives and safety of residents. Thus, they argue that the increased risk of crime which is likely to result from the operation of the contemplated youth detention center is a relevant factor to be explored and investí *630 gated by the Division for Youth and the Office of General Services in the process of making a threshold determination of whether construction of such a facility would have a significant effect upon the quality of the human environment. They urge that, since no findings were made with respect to this issue in the negative declaration, further construction should be restrained until the State agencies have fully assessed this feature.
Responding to the petition here, respondents have interposed an answer. This answer consists of three parts. The first of these is an objection in point of law, in the nature of a demurrer, challenging the sufficiency of the petition, which is a multicount pleading, and is addressed to that pleading as an entirety, and not to any of the seven, individual causes of action set forth therein. The second part consists of general and qualified denials of allegations in the petition, and the third part consists of an affirmative defense to the effect that the negative declaration filed here represents “[a] proper and rational exercise of judgment in conformity with the provisions of SEQR [sic].”
Annexed to the answer in the form of a return are copies of (1) the negative declaration of the Division for Youth, (2) an environmental impact fact sheet, (3) an environmental assessment statement and (4) the report to the Governor on the future of Harlem Valley Psychiatric Center. Also attached to the answer are the affidavits of two employees of the Division for Youth. The first affiant is one John C. Lum, hired as a Youth Facility Director, who is assigned to the proposed detention facility at Harlem Valley and who was employed for that purpose on September 8, 1980, some 11 days before the making of the negative declaration. The second affiant is one J. Thomas Mullen, a Deputy Director for Rehabilitative Services, who claims to have prepared the environmental impact fact sheet previously mentioned. The Lum affidavit was made on October 24, 1980, and the Mullen affidavit was made on October 25, 1980, each nearly five weeks after the negative declaration was made. Each of these affiants attests to the substance of conversations with third parties regarding the effect that the proposed facility would have on the environment. Some *631 of those conversations were held subsequent to the making of the negative declaration.
Respondents’ attack upon the sufficiency of the petition may be readily dispatched. Presumably made under CPLR 7804 (subd [f]), this objection is akin to one made pursuant to CPLR 3211 (subd [a], par 7). (Cf. McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR, C404:l, p 503.) And where as here, the objection is a general one addressed to the whole petition, and not to any of the several causes of action pleaded, it is settled law that, should any one cause of action be sustained as legally sufficient, then the entire petition should be upheld and the objection should be denied in its entirety without consideration of the sufficiency of any of the remaining causes of action. (Kaplan v Simone Bros. Auto Body, 77 AD2d 863, 864.)
Here, the first count of the petition, if deemed to be true, sets forth a cause of action as to the failure of respondents to comply with legal requirements with respect to the environmental impact which the proposed detention facility will have upon the safety of residents and property in the community. (Cf. Hanly v Mitchell, 460 F2d 640, cert den sub nom. Hanly v Kleindienst, 409 US 990; Hanly v Kleindienst, 471 F2d 823; H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222; Matter of Kravetz v Plenge, 102 Misc 2d 622.) Thus, the objection is denied in its entirety.
Whether the Division for Youth properly issued its negative declaration that the disputed project will have no significant impact upon the environment, and that therefore there is no need to file an environmental impact statement, depends upon whether it made a thorough investigation of the problems involved and reasonably exercised its discretion. To support the determination under review the record must show that the division (1) identified the relevant areas of environmental concern, (2) took a hard look at them, and (3) made a reasoned elaboration of the basis for its determination. (H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 232, supra.)
The negative declaration filed on September 19, 1980 may be best characterized as brief. Less than two pages in *632 length, it mentions, in cursory fashion, such factors as water, heat, power generation capacity, water treatment, traffic and parking. Those considerations have application to nearly any building. But it contains no hard look at the distinctive environmental impact of locating a youth detention facility in a residential area. Nor does the declaration comment upon the type of young people to be incarcerated in the facility, the type of crimes of which they will stand charged or convicted, the increased risk of crime which their presence may generate, the number and type of visitors who may be attracted to the facility by their presence and the potential for escapes.
To be sure, the declaration incorporates by reference an environmental impact fact sheet and an environmental assessment statement filed on the same date. The first of these papers appears to supply answers to questions involving services, bodies of water, wetlands, air contamination and wildlife, yet gives no attention to the risks which petitioners fear. The only heed given to those concerns in the second paper appears in three areas of the first page thereof. In the introductory paragraph (A), note is made with regard to the “[legislative mandate [to the Division for Youth] to house youthful criminal offenders in a secure setting”. In paragraph (Bl), reference is made to the fact that a “ [y] outh may be transferred * * * to Secure Centers * * * if the youth has shown himself to be exceptionally dangerous to himself or other persons”. The only mention of security to be found in the second paper appears on the first page as a part of paragraph (C) wherein it is stated that “[i]n order to provide for appropriate security, secure centers have a distinctive secure capability. Access to and from secure centers is always under the strict control of staff. The center is either a single building or a small cluster of buildings in very close proximity to each other, and surrounded by a security fence. Secure centers are characterized by individual rooms for each youth.”
Apparently made aware of the shortcomings of the division’s original determination by petitioners’ allegations, Deputy Director Mullen has filed a postsubmission affidavit with respondents’ papers. Obviously designed to overcome the effect of earlier oversight, this deposition supplies in *633 formation regarding physical features of the proposed detention center including “[a] security fence 12 feet high made of 2 inch mesh wire, anchored 2 feet in the ground and topped by an additional 2 feet of rolled razor ribbon” and the housing of residents. “[i]n individual rooms with locking doors, in living units of no more than 15 residents, which living units may be sealed off if the need arises” and “[s]teel exit doors, locked at all times.”
Coming as it does from the acknowledged draftsman of the division’s environmental assessment statement and of its environmental impact fact sheet, and perhaps the undisclosed author of the challenged negative declaration, and smacking of afterthought, this affidavit comes too late with too little to compensate for deficiencies in the initial declaration.
As previously noted, the Mullen affidavit, like the Lum affidavit, incorporates the substance of extrajudicial statements attributed to various third parties who assertedly had no objection to the disputed project. Rank hearsay, these statements may not be considered by the court.
Nor is there any relevance to the determination of the issues before the court that, as the Attorney-General and the Deputy Director of the Division for Youth argue in their affidavits, (1) there is an acute need in the State for detention facilities for juveniles as is evidenced by pending lawsuits, (2) construction of the facility is under way and partially completed, and (3) that enjoining the project at this stage would result in major financial loss to the State and to the contractors. If the project has proceeded in violation of the law, these factors cannot justify it. (Cf. Continental Illinois Nat. Bank & Trust Co. of Chicago v Kleindienst, 382 F Supp 107, 114.)
Plainly, the record before us shows that the Division for Youth did not meet legal requirements in arriving at its determination that the detention facility at Harlem Valley would have no environmental significance upon the community. Although the Attorney-General conceded in his brief and on argument that the safety of the residents is a matter'of relevant concern, respondents blinked away the citizens’ well-founded fears of escapes and increased crime *634 risk, ignoring such considerations for the sake of expediency and economy. (Cf. Goose Hollow Foothills League v Romney, 334 F Supp 877.) Consequently, the division’s action in issuing the perfunctory negative declaration was arbitrary and capricious.
It goes without saying that where State action such as that at bar may affect the sensitivity of the community, prudence dictates that the agency sponsoring the project give notice of the contemplated action to residents and accept all pertinent information offered by the citizenry with respect to it. Particularly where emotions may be aroused by fears, a public hearing serves the dual purpose of enabling the agency to obtain all relevant data and to satisfy the people that their views are being considered. However, neither SEQRA nor any other State statute requires that such a hearing be held before a threshold determination of environmental significance has been made. Applicable regulatory procedure only permits such a hearing to be held, in the discretion of the agency, after an agency has decided that an environmental impact statement is to be prepared. (6 NYCRR 617.8 [d].)
Notwithstanding the lack of statutory or administrative provisions for such public hearings, in view of the fact that, in an analogous context under the National Environmental Policy Act, the law after which SEQRA was modeled, the Federal courts, proceeding upon the premise that Federal agencies must “ ‘affirmatively develop a reviewable environmental record * * * even for purposes of a threshold * * * determination’ ”, have held that, before a preliminary or threshold determination of significance is made, the responsible agency must give notice to the public of the proposed major Federal action and an opportunity to submit relevant facts which might bear upon the agency’s threshold decision (Hanly v Kleindienst, 471 F2d 823, 836, supra), this court now directs that, upon remand, the Division for Youth shall conduct such a public hearing with as much formality and under such procedure as it determines to be appropriate under the circumstances.
Accordingly, this matter is remanded to the Division for Youth for the purpose of making a further investiga *635 tian of the question of escapes that might occur from the proposed Harlem Valley youth detention center and the increased risk of crime that might result from the operation of that facility, with directions to accept from petitioners and others concerned such evidence as they may proffer within a reasonable period, and with further directions to make findings with respect to these issues, and for the further purpose of redetermining whether the proposed facility significantly affects the quality of the human environment. The stay granted by this court on October 29, 1980, is vacated and the undertaking thereunder is exonerated. Instead, petitioners are granted a preliminary injunction restraining further construction and use of the proposed Harlem Valley youth detention center until such time as the Division for Youth has made a proper redetermination under SEQRA, taking into account all relevant factors, of whether the proposed facility significantly affects the quality of the human environment, upon the condition that they file an undertaking in amount of $5,000 as security for costs (cf. Matter of Policemen’s Benevolent Assn. of Westchester County v Board of Trustees of Vil. of Croton-On-Hudson, 21 AD2d 693, 694-695).