**233 EAST 69TH STREET OWNERS CORP., Plaintiff,**

v.

**Ray LAHOOD, in his capacity as Secretary of the United States Department of Transportation, et al., Defendants.**

No. 10 Civ. 491(WHP).

United States District Court, S.D. New York.

June 6, 2011.

Brad Kenneth Schwartz, Michael David Zarin, Zarin & Steinmetz, White Plains, NY, for Plaintiff.

Philip Elias Karmel, Bryan Cave LLP, Joseph Anthony Pantoja, U.S. Attorney's Office, New York, NY, for Defendants.

### MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge.

Plaintiff 233 East 69th Street Owners Corp. brings this action seeking, *inter alia,* a declaratory judgment that the Defendants United States Federal Transit Administration ("FTA") and the New York Metropolitan Transit Authority ("MTA"), failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Specifically, Plaintiff contends that the Defendants' determination that "no further environmental review was necessary" for an ancillary facility at the 72nd Street station of New York City's Second Avenue Subway was arbitrary and capricious. Both sides move for summary judgment. Defendants also move to strike the affidavits of Robert A. Everett and Jean Savitsk, submitted by Plaintiff in support of its motion for summary judgment. For the following reasons, Defendants' motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied. Defendants' motion to strike the affidavits is also granted.

### BACKGROUND

I. *The Second Avenue Subway and 69th Street Facility*

This action arises over the final design of an ancillary ventilation facility (the "Facility") for the Second Avenue Subway line (the "Subway") in Manhattan. The Facility will be constructed on the northwest corner of 69th Street and Second Avenue (the "Facility Site") to house ventilation and communication systems, cooling equipment, and emergency egress for the 72nd Street subway station. (Administrative Record ("A.R.") 2059–60, 2150.) The Facility Site comprises two lots that combined measure 80 feet deep (along 69th Street) and 50 feet wide (along Second Avenue).

Plaintiff owns 233 East 69th Street, a residential complex adjacent to the Facility Site consisting of two buildings. Building A is 12 stories high and fronts on 69th Street immediately to the west of the Fa-

cility Site, and Building B is 16 stories high and fronts on Second Avenue immediately to the north of the Facility Site. (A.R. 2150, 2288.)

The buildings currently occupying the Facility Site (the "Site Buildings") consist of two five-story residential buildings. (A.R. 2152.) There is a 15–foot gap between Building A and the Site Buildings, while the Site Buildings abut Building B. (A.R. 2150, 2288.) The apartments along the east side of Building A contain windows facing the Facility Site, and the apartments above the 8th floor in both Buildings A and B have views over the roof of the Site Buildings. (A.R. 2288.)

The Facility Site is located in what was delineated in the Subway's Final Environmental Impact Statement ("FEIS") as the 72nd Street Station Study Area ("FEIS Study Area" or "Study Area"), extending from 67th Street to 74th Street, and from First Avenue to Third Avenue. (A.R. 1217.) The Study Area is predominantly residential, and the East 69th Street block between Second and Third Avenues consists entirely of residential buildings. (A.R. 2150.) The avenues in the Study Area are almost entirely fronted by residential buildings with ground floor retail space. (A.R. 2150.) The surrounding area also contains several institutional buildings, including Lennox Hill Neighborhood House on 70th Street, a Memorial Sloan–Kettering Cancer Center facility on 68th between First and Second Avenue, and a number of religious buildings and schools. (A.R. 2147.) Although the buildings in the Study Area are predominantly brick, some buildings have stone or terra-cotta "ornamentation," or "glass curtain-wall façades." (A.R. 2167–68.)

II. *The Environmental Impact Statement*

In April 2004, the MTA published the FEIS. The FTA issued its record of deci-

sion in July 2004. Although the FEIS was completed prior to the design of any ancillary facilities, it contained general assurances regarding their look and feel. Specifically, the FEIS stated that the facilities would be "sensitive to the surrounding architectural context; they would not disturb views in the study area, nor would they change the study area's urban design." (A.R. 80.) The FEIS further stated that the facilities "would be designed to blend into the urban fabric; for example, they could be designed to appear like a neighborhood row house in height, scale, materials, and colors." (A.R. 144.) Finally, the FEIS stated that facilities would be "designed to be compatible with neighborhood character." (A.R. 419.) The FEIS also contained a single "conceptual illustration" ("Conceptual Illustration") in which an ancillary facility appears as a four-story residential building with faux-windows and a red-brick façade. (A.R. 160.)

The FEIS stated that the ancillary facilities "would typically be approximately the same size as a typical rowhouse—25 feet wide, 75 feet deep, and four to five stories high." (A.R. 144.) In other instances, the FEIS stated that the structures would be "about" or "approximately" 75 feet deep. (A.R. 45, 408.) On one occasion, the FEIS stated that the facilities would be "between 20 by 70 feet and 40 by 80 feet." (A.R. 418.)

III. *The Facility's Final Design*

On November 30, 2009, the MTA presented a final design for the Facility that extended the full depth of the Facility Site to approximately 80 feet. (A.R. 1836–37, 2185.) Under that design, the apartments below the 10th floor of Building A would lose their east-facing windows. (A.R. 1836, 2288). The proposed Facility also differed significantly from the conceptual illustration and current Site Buildings.

While the Conceptual Illustration and Site Buildings are residential, the proposed Facility has an institutional appearance. The Facility would have a granite base, terra cotta tiles of "earthen color finish similar to bricks or brownstone," and silver-colored metal slats. (A.R. 2062.) "The corner of the building at the intersection will have a glass curtain-wall extending the full height of the building on both façades." (A.R. 2062.)

## IV.  MTA and FTA Environmental Review of the Proposed Facility Design

In response to public concern over the Facility design, the MTA sought an FTA determination that the design did not require a supplemental environmental impact statement ("SEIS"). (A.R. 1857–1905.) That process culminated with the MTA's Technical Memorandum No. 6 ("Technical Memo," A.R. 2058–86), which concluded that the proposed Facility would not create any significant new environmental impacts. (A.R. 2058.) In reaching this conclusion, the MTA used as a study area the blocks between 66th Street and 74th Street, and between First Avenue and Third Avenue ("Facility Study Area" or "Study Area").[1] (A.R. 2150.) The MTA's study did not rise to the level of a formal "environmental assessment" under NEPA. (See A.R. 2286.) After reviewing the Technical Memo, the FTA issued a memorandum dated September 16, 2010 ("FTA Decision"), which concluded that "there will be no new significant environmental impacts as a result of the final design of the Facility compared to what was evaluated in the FEIS."

Specifically, the FTA found that the Facility's purpose and dimensions were consistent with New York City's land use and zoning policies. (A.R. 2488.) Addressing the loss of Building A windows, the FTA found that:

> The depth and height of the Facility will directly block east-facing windows of eight apartments of Building A. Although these eight apartments will lose light and air from the east-facing windows, because these are floor-through apartments, light and air will still be available through existing windows of the south and north façades. This arrangement is similar for apartments with the same floor plan on the western end of the building, which abuts an adjacent building built to its lot line. The eight apartments that will be impacted will continue to meet the requirements of the New York City Building Code with respect to light and air. Although the loss of light and air is an adverse impact for the residents of the eight apartments, the impact is not significant.

(A.R. 2489–90.)

The FTA also addressed the impact of the Facility's appearance on neighborhood character. First addressing the size of the Study Area, the FTA stated that although it is "much larger than the locally-recommended 400–feet radius, [it] is appropriate because there are several above-ground structures that make up the 72nd Street Station, including station entrances and ancillary facilities, dispersed throughout the Study Area." (A.R. 2490.) The FTA found that within the Study Area, there were several buildings with institutional uses, including a post office, schools, and "hospital-related buildings." (A.R. 2491.) The FTA then noted that the "Study Area

---

1.  This study area is identical to FEIS Study Area except that it extends one block further south. For the sake of simplicity, this Court will refer to both study areas interchangeably as the "Study Area" except where necessary to distinguish them. In such instances, the FEIS study area will be referred to as the "FEIS Study Area," and the newer study area will be referred to as the "Facility Study Area."

contains a mix of material used for façades, including brick, brownstone, polished granite, and glass" and that the "Facility will be built with materials that are consistent with those used in other buildings in the Study Area." (A.R. 2491.)

Specifically, the Facility's terra-cotta tiles "will relate to the masonry façades of buildings in the Study Area ... [and are] consistent with the predominant building material—brick and brownstone"—found therein. (A.R. 2491.) In addition, the Facility's granite base is "consistent with materials used in older residential buildings in the Study Area ... [and] also relates to newer construction such as Trump Place at ... Third Avenue and 69th Street." (A.R. 2491.) The FTA also found that the Facility's glass façade is consistent with the "numerous examples of ground-floor display windows" in the [Facility] Study Area. (A.R. 2491.) Overall, the FTA concluded that:

> [a]lthough illustrations of existing ventilation facilities were provided [in the FEIS] as examples of what ancillary facilities could look like[,] no specific information on the design of any Project ancillary facility was provided. The FEIS provided general guidelines that would be used, such as consistency with urban design, and that community input would be solicited during the design phase. The materials in the façade are sensitive to the surrounding context, do not disturb views within the study area, and do not change the area's urban design. However, as a result of the silver-colored metal slats for louvers located on the façade as well as the lack of residential-style windows, the Facility will look institutional, not residential. In terms of massing, the rectangular shape is consistent with the built context of the Study Area where row houses and many of the apartments are designed with rectangular plans. The massing of the Facility, rectangular with no setbacks, is similar with the massing of the two existing residential buildings on the Facility site. The final design of the Facility is generally consistent with the conceptual design guidelines presented in the FEIS and there will be no significant change in impacts related to visual/neighborhood character as a result of the final size and appearance of the Facility.

(A.R. 2491–92.)

## DISCUSSION

### I. *Motion to Strike Plaintiff's Supporting Affidavits*

As an initial matter, the MTA moves to strike the affidavits of Robert Everett and Jean Savitsk filed in support of Plaintiffs motion for summary judgment. Generally, a court reviewing an agency decision is confined to the administrative record before that agency when it made the decision. *Nat'l Audubon Soc'y v. Hoffman,* 132 F.3d 7, 14 (2d Cir.1997). However, "an extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice," *Hoffman,* 132 F.3d at 14. Extra-record evidence may also be admitted where there are "allegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism ... under the rug." *Suffolk Cty. v. Sec. of Interior,* 562 F.2d 1368, 1385–86 (2d Cir. 1977).

Here, there are no allegations of bad faith. Nor can it be said that the Defendants disregarded any serious envi-

ronmental consequences. To the contrary, the Defendants discussed all potential environmental impacts thoroughly and at length and directly addressed Plaintiff's primary concerns.[2] Accordingly, the MTA's motion to strike these affidavits is granted, and this Court will confine its review to the administrative record.

## II. Summary Judgment

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Davis v. Blige, 505 F.3d 90, 97 (2d Cir.2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has made the initial showing that there is no genuine dispute of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir.2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Har-

ris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505; Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir.2005).

### B. Supplemental Environmental Impact Statements

▉ The FTA must conduct an SEIS whenever "(1) [c]hanges to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) [n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." 23 C.F.R. § 771.130(a). Where the significance of the new impacts is uncertain, the FTA must conduct "appropriate environmental studies or, if the Administration deems appropriate, an [environmental assessment ("EA") ] to assess the impacts of the changes, new information, or new circumstances." 23 C.F.R. § 771.130(c). "When the determination that a significant impact will or will not result from the proposed action is a close call, an [S]EIS should be prepared."[3] Hoffman, 132 F.3d at 13. "It is only when the proposed action will not have a significant effect on the human environment that an [S]EIS is not required." Hoffman, 132 F.3d at 13.

▉ In reviewing an administrative decision not to issue an SEIS, a federal court must undertake a two-step analysis.

---

**2.** Although Hoffman allows supplementation where an agency "failed adequately to discuss some reasonable alternative," Defendants here were not required to consider alternatives, see infra Part II(D). Accordingly, this concern does not apply.

**3.** Although Hoffman is binding precedent, this Court notes the "seeming conflict between such a rule and the highly deferential 'arbitrary and capricious' standard" that generally applies to an agency's determination of whether to conduct an SEIS. Spiller v. White, 352 F.3d 235, 244 n. 4 (5th Cir.2003).

First, a court must consider whether the agency took a "hard look" at the possible effects of the proposed action. *Hoffman*, 132 F.3d at 14. Second, if the agency has taken a "hard look," a court must ask whether the agency's decision was arbitrary or capricious. *Hoffman*, 132 F.3d at 14. Although the "inquiry must be searching and careful," *Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), the arbitrary and capricious standard of review is "narrow and particularly deferential." *Envt'l Def. v. Envt'l Protection Agency*, 369 F.3d 193, 201 (2d Cir.2004). A court may reverse an agency determination only if there has been a "clear error of judgment," *Envt'l Def.*, 369 F.3d at 201, or where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Nat'l Res. Def. Council v. Muszynski*, 268 F.3d 91, 97 (2d Cir.2001). A reviewing court's task is to "decide if the agency has considered the evidence, examined the relevant factors, and spelled out a satisfactory rationale for its action including the demonstration of a reasoned connection between the facts it found and the choice it made." *Envt'l Def.*, 369 F.3d at 201. Under this standard, a reviewing court may not substitute its policy judgments for that of the agency. *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 174 (2d Cir.2006).

Plaintiff argues (1) that the size of the Study Area was arbitrarily large, and (2) that the Facility design will result in significant new impacts due to (a) the effect of its institutional design on the neighborhood character, and (b) the loss of windows in Building A.

### 1. *Study Area*

■ To buttress its assertion that the Facility Study Area was arbitrarily large, Plaintiff points to the City Environmental Quarterly Review Technical Manual ("CEQR"), which states that when assessing impacts of a project on neighborhood character, "the study area should generally include *at least* the project site and the area within 400 feet of the project site boundaries." [4] New York Mayor's Office of Environmental Coordination, *City Envt'l Quarterly Review Tech. Manual* ("CEQR") 22–2 (2010) (emphasis added). The CEQR also notes that "the extent of the study area may be modified, as appropriate, either to include any additional areas that may be affected by the project or to exclude areas that would clearly not be affected by the project." *CEQR* 22–2.

Plaintiff's argument fails for several reasons. First, the CEQR is published by the City of New York and is not binding on federal agencies. In any case, the 400–ft. recommended radius is a *minimum* value; the CEQR does not suggest a *maximum* size beyond which a study area becomes too large. Moreover, the CEQR expressly provides that a study area might be enlarged to include "any additional areas that might be affected by the project." *CEQR* 22–2. Thus, the fact that a study area's radius exceeds 400 feet does not on its own "violate" the CEQR.

In addition, the MTA had good reason to size the Facility Study Area as it did. In establishing the Facility Study Area, the MTA largely adopted the FEIS Study Area. (A.R. 2149.) The FEIS Study Area boundaries, in turn, were based on the fact

---

**4.** Thus, the CEQR recommends a study area of at least 500,000 square feet (assuming a circle with a radius of 400 feet). The Facility Study Area is approximately 2.9 million square feet, or slightly less than six times the minimum size recommended by the CEQR.

that they comprised "those blocks surrounding a proposed construction site that could be most directly affected by construction activities." (A.R. 1181.) This encompassed "one avenue east and west of the subway alignment, and one block north and south of the station excavation area." (A.R. 1181.) Moreover, as the FTA noted, the FEIS Study Area was appropriate because "there are several above-ground structures which make up the 72nd Street Station, including station entrances and ancillary facilities, dispersed throughout the [FEIS] [S]tudy [A]rea." (A.R. 2490.)

The MTA's decision to model the Facility Study Area on the FEIS Study Area was entirely reasonable. The FEIS analyzed the neighborhood characteristics of the FEIS Study Area in considerable detail. (See A.R. 1192–93.) Using a similar area for the Facility Study Area served the desirable interests of continuity between the two studies. The sole difference between the Facility Study Area and the FEIS Study Area is the fact that the Facility Study Area extends one block further south. The MTA justified this due to "the Facility Site's location near the southern end of the [FEIS] [S]tudy [A]rea." (A.R. 2149.) This minimal departure was supported by a plausible rationale and was not arbitrary and capricious.

Agencies should be given wide latitude in determining the appropriate size of a study area, particularly when evaluating the impacts on a "neighborhood." The term "neighborhood" encompasses a diverse range of sizes and shapes not amenable to precise delineation. In determining whether the size of the Facility Study Area was arbitrary and capricious, this Court must assess whether the Study Area is so large as to arbitrarily dilute the environmental impacts of the proposed action. That is not the case here. The FTA examined the impacts of the Facility based on a "neighborhood" measuring two blocks by eight blocks—one block to the east and west of the Facility, five blocks to the north, and three blocks to the south. This size fits comfortably within the lay conception of a "neighborhood" and does not arbitrarily dilute the visual impact of the Facility.

### 2. *Significant New Impacts*

#### a. *Neighborhood Character*

█ NEPA requires an assessment of a project's impacts to neighborhood character, including "[u]rban quality, historic and cultural resources, and the design of the built environment." 40 C.F.R. § 1502.16(g); 40 C.F.R § 1508.8(b) ("effects" includes "aesthetic" effects); *Hanly v. Kleindienst,* 471 F.2d 823, 832 (2d Cir. 1972) (proposed jail did not require supplemental review where the design "would harmonize architecturally with existing buildings in the area"). Plaintiff asserts that the institutional design of the Facility does not harmonize architecturally with the existing neighborhood character.

Initially, this Court was struck—as were the Plaintiffs—by the profound difference between the FEIS's original conceptual "residential" facility design and the final "institutional" one. Any reasonable person reading the FEIS might be left with the impression that the Facility would be designed to appear as a residential building. This Court wonders whether a more determined effort at transparency by Defendants could have obviated the need for this lawsuit. If this Court had the power to substitute its own judgment for that of the agency, it would be inclined to agree with Plaintiff. But NEPA "is a procedural statute that mandates a process rather than a particular result." *Coal. on W. Valley Nuclear Wastes v. Chu,* 592 F.3d 306, 311 (2d Cir.2009). And NEPA expressly creates procedures for altering a project after the FEIS is complete. Accordingly, this Court must confine its in-

quiry to whether the MTA and FTA complied with the procedures mandated by NEPA.

The Facility design constitutes "new information ... relevant to environmental concerns" and therefore requires an assessment of whether it creates "significant environmental impacts not evaluated in the EIS." 23 C.F.R. § 771.130(a). To that end, the MTA engaged in a thorough review of the Facility's impacts, culminating in the Technical Memo, which the FTA approved. These studies analyzed the Facility's impact on neighborhood character in depth, specifically addressing its institutional appearance and building materials. They discussed the range of building types and uses in the Study Area, reviewed each building material used in the Facility's façade, and compared these materials to other buildings in the Study Area. In doing so, the FTA took a "hard look" at the aesthetic consequences of the new Facility design. *See Friends of Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1557 (2d Cir. 1992) (agency took a hard look where it, *inter alia*, "examined the Project's impact on the aesthetic, cultural, historical, and recreational aspects of the site"); *Coalition on W. Valley Nuclear Wastes v. Bodman*, 625 F.Supp.2d 109, 120 (W.D.N.Y. 2007) (agency took a hard look where it "adequately compiled relevant information, [and] ... analyzed it reasonably without ignoring pertinent data").

Review of the FTA Decision is thus "narrow and particularly deferential," *Envt'l Def.*, 369 F.3d at 201, and this Court cannot conclude that it was arbitrary and capricious. This is not a case where the FTA has made a clear error in judgment, entirely failed to consider an aspect of the problem, or offered an explanation that runs counter to the evidence. Rather, the FTA Decision was reasoned and thorough. Although the FEIS is sparse on design details of the facilities, that is because

FTA regulations *prohibit* "final design activities" until "[a] final EIS has been approved and ... a record of decision has been signed." 23 C.F.R. § 771.113(a)(iii). The FEIS provided only broad design guidelines for ancillary facilities collectively. The primary guidepost for these designs is *"consistency"* with the surrounding environment. (A.R. 2290.) Thus, the FEIS stated that the facilities would be "sensitive to the surrounding architectural context," "designed to blend into the urban fabric," and "designed to be compatible with neighborhood character." (A.R. 80, 144, 419.) To be sure, the FEIS sends a confusing message by stating that ancillary facilities "could be designed to appear like a neighborhood rowhouse" and including the Conceptual Illustration, which resembled a four-story rowhouse. (A.R. 114, 160.) Ultimately, however, the Defendants did not commit to any one type of building.

Although the Facility Study Area is predominantly residential, it is far from a homogenous neighborhood of four-story brick and brownstone buildings. The "urban fabric" of New York's Upper East Side—and of the Study Area—is a patchwork of buildings that vary greatly by height and appearance and support a variety of residential, commercial and institutional uses. Thus, the Facility need not appear as a four-story brownstone in order to achieve consistency with the neighborhood's character. The MTA· found—and the FTA agreed—that although the Study Area was predominantly residential, the Facility's architectural features find parallels in existing buildings. Specifically, the FTA noted that the terra-cotta is similar to the neighborhood's brownstone and brick, the granite base is consistent with older residential buildings, and that the glass façade is consistent with ground-floor commercial displays. These determinations comport with the evidence and can-

not be characterized as arbitrary and capricious.

Plaintiff argues that there is no other building in the Study Area that resembles the proposed Facility or combines its unique features into a single building. But the fact that a building is different does not render it inconsistent with the character of a neighborhood that already contains a diverse array of building types and materials. Of course, a building may be so starkly different from the surrounding neighborhood that an agency determination of "consistency" is arbitrary and capricious. But that tipping point has not been reached here.

Plaintiffs also argue that the Second Circuit's opinion in *Hanly* necessitates a finding that the FTA Decision was arbitrary and capricious. In *Hanly*, the Court of Appeals upheld an agency's determination that a proposed jail in lower Manhattan would not have a significant environmental impact because, *inter alia*, "[t]he [agency's] finding that the [jail] would harmonize architecturally with existing buildings in the area, and even enhance the appearance of the neighborhood, is supported by details of the proposed building, architectural renditions, and photographs of the area." *Hanly*, 471 F.2d at 832. Because the FTA Decision is supported by similar evidence in the record, *Hanly* supports, rather than undermines, Defendants' position.

Accordingly, the Defendants' determination that the Facility's institutional design will not result in significant new environmental impacts was neither arbitrary nor capricious.

#### b. *Windows/Setback*

Plaintiff next argues that the elimination of Building A's windows constitutes a significant new impact. As an initial matter, this Court must determine whether the Facility's proposed size in fact constitutes a change in the parameters described in the FEIS. The FEIS gives two slightly different dimension estimates. It stated that ancillary facilities would be "*approximately* the same size as a typical rowhouse—25 feet wide, 75 feet deep" (A.R. 144 (emphasis added)), "*about* . . . 75 feet deep" (A.R. 45 (emphasis added)), or "*approximately* . . . 75 feet deep" (A.R. 468 (emphasis added)). On one occasion, however, the FEIS stated that the dimensions would be "between 20 by 70 feet and 40 by 80 feet." (A.R. 418.) Thus, the FEIS, limited by the legal prohibition against final design actions prior to the record of decision, set no precise size for the Facility. Instead, it provided an "approximate" depth of 75 feet, implying that the depth might be slightly different. And in one instance, the FEIS provided for a maximum depth of 80 feet, the precise depth of the Facility. Accordingly, the FEIS contemplated that the Facility might extend to its western lot line, and the Facility design does not represent a substantial departure from the FEIS.

In any event, Defendants' determination that the 80–foot depth does not present a significant new environmental impact meets NEPA's procedural requirements. Defendants examined the impacts to the windows and concluded that they were not significant because "light and air will still be available through existing windows of the south and north façades," "[the resulting] arrangement is similar for apartments with the same floor plan on the western end of [Building A]," and "[t]he eight apartments that will be impacted will continue to meet the requirements of the New York City Building Code with respect to light and air." (A.R. 2489–90.) This determination is consistent with the evidence, and neither arbitrary nor capricious.

#### C. *Consideration of Alternative Designs*

Plaintiff argues that Defendants violated NEPA by failing to consider alternative

designs for the Facility in determining whether an SEIS was required. However, there is no requirement that an agency consider reasonable alternatives when conducting an "environmental study." *See* 23 C.F.R. § 771.130(c); *cf.* 23 C.F.R. § 771.119(b) (agency required to consider reasonable alternatives when conducting an environmental assessment); 23 C.F.R. § 771.123(c) (agency required to consider reasonable alternatives when conducting an environmental impact statement). Accordingly, Defendants' failure to consider alternative designs was not a violation of NEPA.

### D. *Opportunity for Public Comment*

Finally, Plaintiff argues that Defendants "undermined the spirit and intent of NEPA" by failing to elicit public comment on the Facility design. Although public participation and comment is one aim of NEPA, the "spirit and intent" of a statute cannot trump its explicit requirements. *See United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). While NEPA requires notice and comment procedures for both EAs and EISs, 23 C.F.R. §§ 771.119(d)-(f), 771.123(g)-(i), there is no such requirement for an "environmental study." *See* 23 C.F.R. § 771.130; *see also Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 560 (9th Cir.2000) ("Although NEPA requires agencies to allow the public to participate in the preparation of an SEIS, there is no such requirement for the decision *whether* to prepare an SEIS.... [T]he public comment process ... is not essential every time new information comes to light after an EIS is prepared. Were we to hold otherwise, the threshold decision not to supplement an EIS would become as burdensome as preparing the supplemental EIS itself, and the continuing duty to gather and evaluate new information ... could prolong NEPA review beyond reasonable limits.") Thus, Defendants were not re-quired to solicit public comment in their environmental study of the impacts of the Facility design.

Plaintiffs also note that the FEIS states that "[c]ommunity input on the design of ventilation facilities would be solicited." (A.R. 418.) Putting aside the issue of whether a statement in an FEIS creates a legally binding promise, it is clear that the MTA solicited community input on the design of the Facility. For example, the MTA presented the Facility design to the community at a public meeting on November 30, 2009 (A.R. 2185) and met with Plaintiffs several times between December 2008 and December 2009. (*See* A.R. 1840, 1844, 2186–87, 2433.) Accordingly, the Defendants satisfied whatever public input commitments they established for themselves in the FEIS.

### CONCLUSION

For the foregoing reasons, Plaintiff 233 East 69th Street Owner's Corp.'s motion for summary judgment is denied, and Defendants MTA's and FTA's motions for summary judgment dismissing this action are granted. The MTA's motion to strike the affidavits of Robert A. Everett and Jean Savitsk is also granted. The Clerk of Court is directed to terminate the motions pending at Docket Entry Nos. 27, 37, and 39 and mark this case closed.

SO ORDERED.